JS 44 (Rev. 04/21)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Cheryl D. Hardy

**DEFENDANTS**

The Trustees of the University of Pennsylvania, Sophia Lee, Christopher Wailoo, Claire Wallace, Angela Cabrera,

**(b)** County of Residence of First Listed Plaintiff    **Delaware**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Law Offices of Robert T Vance Jr, 123 South Broad Street, 15th Floor, Philadelphia PA 19109 267-887-0172

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 USC Section 2601
Brief description of cause:
FMLA interference and retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE   **N/A**      DOCKET NUMBER

DATE
February 9, 2026

SIGNATURE OF ATTORNEY OF RECORD
*(signature)*

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: _Philadelphia, PA_

---

***RELATED CASE IF ANY:*** Case Number: _None_     Judge:_____

1. Does this case involve property included in an earlier numbered suit?     Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?     Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?     Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?     Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply?
If yes, attach an explanation.     Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A. Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☒ 8. Employment
- ☐ 9. Labor-Management Relations
- ☐ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief **\*see certification below\***
- ☐ 16. All Other Federal Question Cases. *(Please specify):*_____

*B. Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify)*:_____
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases: *(Please specify)*_____
_____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒   Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐   None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**United States District Court for the Eastern District of Pennsylvania**

| | | |
|---|---|---|
| Cheryl D. Hardy | : | |
| | : | |
| vs | : | Civil Action No. |
| | : | |
| The Trustees of the University of | : | |
| Pennsylvania, Sophia Lee, Christopher | : | **Jury Trial Demanded** |
| Wailoo, Claire Wallace, Angela Cabrera, | : | |
| Jo-Ann Verrier, Ian Semmler, and | : | |
| Christine Droesser | : | |

## *Complaint*

Plaintiff, Cheryl D. Hardy, brings a series of claims against Defendants, The Trustees of the University of Pennsylvania, Sophia Lee, Christopher Wailoo, Claire Wallace, Angela Cabrera, Jo-Ann Verrier, Ian Semmler, and Christine Droesser, of which the following is a statement:

1.  This case concerns the utter failure of the management and leadership of the University of Pennsylvania and the University of Pennsylvania Carey School of Law to safeguard the rights of a long-time senior employee and alumna, and to take any action to prevent that result when they were expressly told, in real time, that it would occur. Defendants engaged in interfering, reckless, retaliatory, and discriminatory actions with total disregard for the consequences their actions could and did have on Hardy's physical and emotional well-being, and in the process violated established laws and University of Pennsylvania processes, procedures, and protocols.

### *Jurisdiction and Venue*

2.  This Court has original jurisdiction to hear this Complaint and adjudicate the claims stated herein under 28 U.S.C. §§ 1331 and 1343, this action being brought under the

Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., and the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071 (Nov. 21, 1991), to redress and enjoin the discriminatory and retaliatory practices and interference of defendants. This Court may exercise supplemental jurisdiction over Hardy's state law claim pursuant to 28 U.S.C. §1367.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this case occurred in this judicial district.

4.      Hardy will timely file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") alleging disability discrimination. Upon receipt of a Notice of Right to Sue ("NRTS") from the EEOC, Hardy will amend this Complaint to assert additional claims.

### *Parties*

5.      Plaintiff, Cheryl D. Hardy is a female citizen of the United States and a resident of this judicial district.

6.      Defendant, The Trustees of the University of Pennsylvania ("Penn"), is the governing body overseeing the University of Pennsylvania, and provides undergraduate and graduate programs, including in law through the University of Pennsylvania Carey Law School ("Carey" or the "Law School"), and other disciplines. It has a principal place of business located at 3819 Chestnut Street, Philadelphia, Pennsylvania 19104.

7.      Defendant, Sophia Lee, is Dean of Carey, the Bernard G. Segal Professor of Law, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

8.      Defendant, Christopher Wailoo, is the Associate Dean for Finance and Administration and Chief Information Officer at Carey, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

9.      Defendant, Claire Wallace, is the Associate Dean for Academic Affairs and Registrar at Carey, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

10.     Defendant, Angela Cabrera, is the Executive Director of Human Resources, at Carey, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

11.     Defendant, Jo-Ann Verrier, is the former Vice Dean and Head of Human Resources at Carey, and currently Carey's Human Resources Consultant, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

12.     Defendant, Ian Semmler, is the Director of Fiscal Operations at Carey, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

13.     Defendant, Christine Droesser, is the Associate Dean and Chief Information Officer at Carey, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

14.     At all times relevant to this action, defendants were "employers" within the meaning of the FMLA and applicable state law.

15.     The acts set forth in this Complaint were authorized, ordered, condoned, ratified and/or done by defendants' officers, agents, employees and/or representatives while actively engaged in the management of defendants' business and pursuant to defendants' official policies and customs.

### *Background Facts*

16.     Hardy is a 1994 alumna of Carey and has been employed by Penn as the Associate Dean, Legal Education Programs, at Carey for over 15 years with an unblemished record of service and leadership.

17.     Hardy suffers from a debilitating and extremely dangerous autoimmune condition, giant cell arteritis, which was diagnosed in April 2024 by Penn's physicians and which was known to her supervisor, Wallace, and others.

18.     In September 2025, Hagana Kim, Hardy's direct report, sought the immediate termination of another of Hardy's direct reports, Ned Hawkins. Hardy was keenly aware of Kim's frustration with Hawkins, was concerned about Kim's mental state, and limited Kim's contact with Hawkins where she could. Hardy explained to Kim that there were University policies, processes, and procedures that had to be followed and that she could not immediately terminate Hawkins.

19.     To escalate his concerns, Hardy reached out to both Cabrera and Wallace as early as September 19, 2025, by email, in-person, and text. Hardy advised Kim to continue to document his concerns and told Kim she was doing what she could to give him the opportunity to address his concerns, including his departmental concerns, directly with Cabrera and Wallace.

20.     On September 26, 2025, Kim told Hardy that Cabrera continually rescheduled a meeting with him, and that the meeting now was scheduled for the week of September 29, 2025.

21.     On September 29, 2025, at 10:38 a.m., Hardy emailed Cabrera stating that Kim was scheduled to meet with Cabrera that week, and that she wanted to forward an email to her sent by Kim to Hardy regarding Kim's concerns.

22.     On October 3, 2025, Kim told Hardy he did not meet with Cabrera that week and that he was becoming increasingly frustrated.  In response, that same day Hardy sent a text message to Wallace asking Wallace to call her.  Wallace did not reply until October 6, 2025.

23.     On October 7, 2025, Hardy received a text message from Wallace stating that Cabrera wanted to meet the morning of October 8, 2025, before making any outreach to Kim.

24.     On October 8, 2025, Hardy asked Cabrera if she had connected with Kim. Cabrera lied and said she had done so, even though Kim and Wallace expressly stated that she had not.

25.     On October 8, 2025, during a Teams meeting call at 10:00am, Cabrera was visibly agitated, verbally scolded Hardy, told Hardy she would not speak with her about Kim, and stated that Wallace was not permitted to tell Hardy that Kim had spoken with Wallace and Wailoo. Hardy was stunned.  To protect her health and well-being, Hardy replied "okay", politely left the call, and sent an email to Wallace informing Wallace of what Cabrera said; that the situation was now out of Hardy's hands; and that it was fine with Hardy that Wallace and Cabrera proceed with Kim's complaint as they saw fit.  *See* Exhibit A attached hereto and made a part hereof.

26.     Hardy told Wallace she did not feel comfortable attending a 2:00pm meeting with Cabrera, to which Wallace had summoned her, due to her medical condition, and given what Cabrera had said, Hardy asked if it was necessary that she attend the meeting. Wallace insisted that Hardy attend the 2:00 PM meeting. *Id.*

27.     At the outset of the October 8, 2025 meeting, Hardy asked Wallace if she had received the email regarding her medical condition.  Wallace chuckled, smiled and replied, "Yes, I have never heard that."   Hardy took her backpack to the meeting fully intending to leave for the day after the meeting as she already felt her stress level increasing.

28.     During the October 8, 2025 meeting, Cabrera had in her hands a 4-5 page document. Hardy stated she would provide a response to the Kim complaint if she were given the opportunity to view it in its entirety. Cabrera and Wallace repeatedly refused Hardy's request, and instead repeatedly pressured Hardy to provide a response. In fact, although she refused to give Hardy a copy of the Kim complaint, Cabrera told Hardy that she needed a response by Friday, October 10, 2025.

29.     Hardy told Wallace and Cabrera that if Hawkins was to be terminated, he should have been terminated long ago for what was probably stated in the Kim complaint and much more, but that her prior manager and Head of Human Resources, Verrier, consistently circumvented his termination and told Hardy to lean into what Hawkins could do best and the department would be given another full-time employee.

30.     Despite Wallace repeating confidential human resource information about Kim of which she should have had no knowledge, when asked, Wallace stated the confidential information was told to her by Verrier. Wallace and Cabrera claimed to have no knowledge of any human resources information about Hawkins and continued to pressure Hardy to provide a response to Kim's complaint without allowing her to see the complaint.

31.     During the meeting Hardy stated that the process Wallace and Cabrera were engaging in was highly unethical and did not comply with Penn policies, processes, and procedures. At the conclusion of the meeting, Hardy reiterated to Wallace and Cabrera that their actions seriously negatively impacted her health, and further told them she intended to file an internal complaint against them because of their conduct and their unethical processes and procedures.

32.     During the evening of October 8, 2025, Hardy entered a request for four (4) sick/FMLA days in Penn's Workday system, noting in the "Comments" section that due to mishandling of a work situation, she was requesting sick days to prevent a flare up of her autoimmune condition. Hardy's request was approved, which was acknowledged by Wallace in an email on which Cabrera was copied, stating that she hoped Hardy was doing well, but still demanding a reply to the complaint. *See* Exhibit B attached hereto and made a part hereof.

33.     On October 9, 2025, Hardy printed out the required FMLA forms, accessed the MyPenn Medicine portal and told her doctor that she was experiencing a very difficult and stressful work situation, that the right side of her head, right eye, and face were hurting, and that she would drop off the FMLA forms for him to complete.

34.     While entering her request for FMLA into Workday, Hardy saw that at 6:38 pm, October 8, 2025, Kim submitted a request for four sick days off, stating "Hi Cheryl, I need a break for my mental well-being and at Angela's suggestion, I am requesting a short leave of a week . . ." further evidencing that Cabrera did not meet with Kim until after the 2:00 p.m. meeting on October 8, 2025. *See* Exhibit C attached hereto and made a part hereof. Kim's request for four sick days should have also triggered FMLA but Hardy did not receive a notice. On October 8, 2025, at 8:12 pm, Hardy received an email from Cabrera thanking Hardy for attending the meeting with her and Wallace, asking her to reply to four bullet points that had been copied and pasted into the email (which contained several inaccuracies), and stating that she needed Hardy's response by October 10, 2025.

35.     Workday is a platform that harnesses powerful, cloud-based technology to enhance security and compliance. Penn uses Workday for human resources, payroll, and job-related learning. Workday provides the Penn community with 24/7 access to a secure network.

With Workday, users are empowered to complete several categories of functionality, including entering time and reviewing and approving time for others, and requesting time off and leave, and reviewing and approving leave for others. Requests for FMLA leave are made and managed through Workday.

36.    Workday allows a user to delegate certain Workday business process items to another user as permitted by the relevant policy. However, tasks can only be delegated by the user themselves, unless they are incapacitated and must be delegated to someone in an equal or more senior position to the user. At the time in question, all delegations were required to be approved by Semmler, with the assistance of Droesser, who determine if the delegation is appropriate.

37.    On October 10, 2025, Hardy received a notice through Penn's Workday system that a 22-day FMLA leave request, from October 9, 2025, through October 31, 2025, had been submitted and processed on her behalf. *See* Exhibit D attached hereto and made a part hereof.

38.    At no time did Hardy authorize anyone to submit any FMLA leave request on her behalf.

39.    Hardy replied that she had only requested four FMLA sick days and would be returning to work the following week. *Id.*

40.    Dawn Lewis, Senior Benefits Specialist, FMLA/STD, Division of Human Resources replied that "Someone had to request the FMLA days, which means if you did not, your manager or someone else in the department requested the FMLA time." *Id.*

41.    Section 631.5 of Penn's FMLA Policy provides that the *employee* must initiate their leave through Workday and only if the employee is unable to make the request on their

own, the employee's supervisor can make the request on the employee's behalf if requested by the employee or the employee's representative.

42.    Following submission of the unauthorized 22-day FMLA request, Hardy's Workday supervisory permissions and team management authority were reassigned and delegated to Wallace and Cabrera. *Id.*

43.    Hardy did not submit this request. Delegation of Workday responsibilities require strict adherence to Penn's processes and security protocols and provides that the individual submit the request for delegation in alignment with the step-by-step guide. Only if the individual is incapacitated can a supervisor initiate this action. In addition, the delegate(s) have to be in a similar or higher position which Cabrera is not. *Id.*

44.    Hardy emailed Wallace on October 10, 2025, asking Wallace if she had put in the 22-day FMLA request for Hardy. Hardy followed up with another email to Wallace asking if Wallace submitted a request delegating her Workday tasks to Wallace and Cabrera as Hardy did not submit the request. *See* Exhibit E attached hereto and made a part hereof. Hardy also sent a text message to Wallace asking the same questions.

45.    Wallace responded back by email. "Hi – again, I think Angela [Cabrera] can answer this. In response to the Workday delegation, Wallace replied by email saying "I did not. I'm copying Angela [Cabrera] here and ask that she reply." *See* Exhibit D attached hereto and made a part hereof. Wallace also replied via email, "I got a notice from Ian that I was your delegate." *Id.*

46.    Wallace replied by text "I've copied Angela on your messages. I think she can best answer the FMLA and Workday delegation. I have not submitted anything other than what came into my mailbox today – Hagana's requested time off and I see Julia's time sheet is in. Let

me know if you have any questions and I wish you a speedy recovery. *See* Exhibit F attached hereto and made a part hereof.

47.    On October 10, 2025, at 4:49pm, by email Hardy told Wallace that Hardy had not authorized anyone submitting a FMLA request on her behalf, that Hardy was the only person authorized to initiate the delegation of her tasks in Workday, and that Wallace and Cabrera were not in compliance with Penn processes and procedures and had overridden security protocols. *See* Exhibit D attached hereto and made a part hereof.

48.    On October 10, 2025, Hardy sent an email to Lynnea Carrington, the Law School contact in University Human Resources, stating she wished to file a formal complaint/grievance against Wallace, Wailoo, and Cabrera, and that Hardy was concerned about retaliation and was very unfamiliar with these processes. *See* Exhibit G attached hereto and made a part hereof.

49.    On October 11, 2025, Hardy later received an email from Cabrera stating that Cabrera and others had unilaterally "proactively" decided to submit the 22-day request on Hardy's behalf in response to Hardy's statement during the October 8, 2025 meeting that she intended to file a complaint against Cabrera and Wallace. *See* Exhibit D attached hereto and made a part hereof.

50.    These actions on the part of Cabrera and others violated the FMLA, as well as Sections 631.3 (Qualified Leave Reasons) and 631.5 (Application) of the University's FMLA Policy and Procedure Manual, *see* Exhibit H attached hereto and made a part hereof.

51.    On October 10, 2025, Hardy informed Lee and R. Polk Wagner, Deputy Dean of Academic Affairs of the Law School, that she intended to file an internal complaint against Wallace, Cabrera, and Wailoo, who oversees all of the departments involved in processing the unauthorized 22-day FMLA request, overriding security protocols, and Hardy's delegating

Hardy's job responsibilities in Workday to Wallace and Cabrera, removing access to Workday, email, and the entire MS365 office suite, and placing a first-person out-of-office message as an automatic reply in Outlook.  Hardy expressly advised Lee about these events, that she would be taking four (4) days off to temper her stress due to her medical condition, that she could not stop crying when thinking about what Wallace, Cabrera, and others were doing to her, and that she would return to work on October 15, 2025.  *See* Exhibit I attached hereto and made a part hereof.  Lee took no action to address Hardy's situation or concerns.

52.     On October 11, 2025 at 8:06 a.m., Hardy sent an email to Wallace stating that with things unfolding as they were, Hardy was compelled to return to work on Monday, October 13, 2025.  On October 12, 2025 at 7:45 p.m., Wallace replied, requesting that Hardy work from home "given the way things transpired' and concluded in last week's meeting and in the meantime please let her know when Wallace could expect Hardy's responses to Kim's complaint.' " *See* Exhibit J attached hereto and made a part hereof.

53.     On October 13, 2025, at 7:12 AM, Hardy submitted a formal complaint against Wallace, Cabrera, and Wailoo.  *See* Exhibit K attached hereto and made a part hereof.

54.     After previously stating on October 12, 2025, that Hardy should work from home, on October 13, 2025, at 8:45 AM, Wallace notified Hardy "that, in light of the nature of your behavior and the concerns raised in our meeting with Angela Cabrera on Thursday, October 9, it is necessary to place you on an immediate leave of absence with pay," and that she was temporarily relieved of her duties.  *See* Exhibit L attached hereto and made a part hereof.  In addition, Hardy's email account, MS365 access, and access to Workday were suspended, Wallace and Cabrera took over all of Hardy's accounts and, in further violation of policy, placed a first-person impersonation of Hardy in an automatic out of office reply on her email account.

55.    On October 14, 2025, in response to Wallace downplaying the seriousness of Hardy's disability, Dr. Colin Ligon placed in Hardy's MyChart portal a letter describing Hardy's disability in detail. *See* Exhibit M attached hereto and made a part hereof.

56.    On October 20, 2025, Hardy met with Lynnea Carrington, Sr. Staff and Labor Relations Specialist, Penn's Division of Human Resources, regarding Hardy's internal complaint. Carrington told Hardy that she would investigate Hardy's internal complaint.

57.    On December 24, 2025, Carrington informed Hardy through a letter sent by email that she had concluded her investigation of Hardy's internal complaint against Wallace, Cabrera, and Wailoo, that her investigation did not substantiate a violation of Penn policy, and that Penn considered the matter closed. *See* Exhibit N attached hereto and made a part hereof. However, Hardy was never interviewed, allowed to submit evidence, or given a copy of the investigation report as required by Penn's Formal Grievance Policy. *See* Exhibit O attached hereto and made a part hereof.

58.    By email dated January 28, 2026, Wallace informed Hardy that she expected Hardy to complete an operations and planning report for 2026 by February 11, 2026, effectively placing Hardy on a performance improvement plan, and to formally return to work on February 26, 2026. In making this return-to-work directive, Wallace expressly referenced, and stated that she would address on February 26 at an in-person meeting with Carrington present, "your conduct during our October 8, 2025, meeting, as well as continue our conversation about concerns raised by colleagues regarding your supervision." *See* Exhibit P attached hereto and made a part hereof.

59.    Under the circumstances, by sending the January 28, 2026 email and expressly referencing the October 8, 2025 meeting as to which Hardy had filed a formal internal complaint

and the impact of which significantly endangered Hardy's health, Wallace effectively constructively discharged Hardy by perpetuating and condoning a toxic and hostile work environment for Hardy, further placing Hardy's physical and mental well-being in jeopardy.

60.     Hardy has suffered, is now suffering, and will continue to suffer severe emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses as a direct and proximate result of defendants' actions.

61.     By reason of defendants' discrimination, retaliation and interference, Hardy suffered and will suffer in the future extreme harm, including loss of income and other employment benefits, loss of professional opportunities, embarrassment and humiliation.

62.     Defendants acted and failed to act willfully, maliciously, intentionally, and with reckless disregard for Hardy's rights.

### Count I

### Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

63.     Plaintiff incorporates herein by reference as if set forth in full the averments of paragraphs 1-62, inclusive, of this Complaint.

64.     When employees invoke rights granted under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" those rights, nor may employers "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful."

65.     An individual supervisor and others working for an employer may be liable as an employer under the FMLA.

66.     Hardy is an eligible employee under the FMLA, defendants are employers subject to the FMLA's requirements, Hardy was entitled to FMLA leave, Hardy gave notice to

defendants of her intention to take FMLA leave, Hardy suffered an adverse employment decision after invoking her right to FMLA leave, the adverse employment decision was causally related to her invocation of her FMLA rights, and she effectively was denied benefits to which she was entitled under the FMLA.

67.    The actions of the defendants described above constitute interference with Hardy's FMLA rights and retaliation for her invocation of her FMLA rights.

68.    Defendants' conduct deprived Hardy of the rights, privileges, and immunities guaranteed to her under the FMLA.

69.    By reason of defendants' interference and retaliation, Hardy is entitled to all legal and equitable relief available under the FMLA, including liquidated damages.

### Count II

#### _Intentional Infliction of Emotional Distress_

70.    Plaintiff incorporates herein by reference as if set forth in full the averments of paragraphs 1-69, inclusive, of this Complaint.

71.    The conduct of the defendants described above was extreme and outrageous, intentional or reckless, and caused Hardy severe emotional distress.

72.    By reason of defendants' intentional infliction of emotional distress upon Hardy, she is entitled to all available legal and equitable relief.

### Jury Demand

Hardy hereby demands a trial by jury as to all issues so triable.

### Prayer for Relief

Wherefore, Plaintiff, Cheryl D. Hardy, respectfully prays that the Court:

     a.      adjudge, decree and declare that the actions and practices of defendants complained of herein violated her rights under the FMLA and common law;

     b.      order defendant Penn to provide appropriate job relief to Hardy;

     c.      enter judgment in favor of Hardy and against defendants for all available remedies and damages under law and equity, including, but not limited to, back pay, front pay, past and future mental anguish and pain and suffering, and liquidated damages in amounts to be determined at trial;

     d.      order defendants to pay the attorney's fees, costs, expenses and expert witness fees of Hardy associated with this case;

     e.      grant such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable; and

     f.      retain jurisdiction until such time as the Court is satisfied that defendants have remedied the unlawful and illegal practices complained of herein and are determined to be in full compliance with the law.

Robert T Vance Jr, Esquire
Law Offices of Robert T Vance Jr
123 South Broad Street, 15th Floor
Philadelphia PA 19110
267 887 0172 tel / 215 501 5380 fax
rvance@vancelf.com

*Attorney for Cheryl D. Hardy*

# Exhibit A

**From:** Cheryl Hardy
**Sent:** Wednesday, October 8, 2025 1:56 PM
**To:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** RE: I Need To Speak With You As Soon As Possible

Dear Claire,

I feel very uncomfortable with the way this is all being handled. This should have been handled totally differently.

I will attend the meeting, but I have nothing to contribute. I have giant cell arteritis totally stressed induced and I must protect my mental health and wellbeing.

Best,

Cheryl


Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



**From:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Sent:** Wednesday, October 8, 2025 11:58 AM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Subject:** RE: I Need To Speak With You As Soon As Possible


Cheryl,


We really need you to meet with us. Your attendance is critical!  Angela is coming in the office in person and we can meet in her office at 2:00.


Hope to see you then.


Claire



**From:** Cheryl Hardy <chardy1@law.upenn.edu>
**Sent:** Wednesday, October 8, 2025 11:23 AM
**To:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** RE: I Need To Speak With You As Soon As Possible

At this point, Claire. I really have nothing to say.  This is clearly now out of my hands.  Again, proceed as you see fit.


Best,

Cheryl


Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104




---

**From:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Sent:** Wednesday, October 8, 2025 11:21 AM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Subject:** RE: I Need To Speak With You As Soon As Possible


I think so, yes.

---

**From:** Cheryl Hardy <chardy1@law.upenn.edu>
**Sent:** Wednesday, October 8, 2025 11:17 AM
**To:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** RE: I Need To Speak With You As Soon As Possible


Claire –


Is it necessary that I attend the 2pm meeting?  You all can proceed as you see fit.


Best,

Cheryl

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



**From:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Sent:** Wednesday, October 8, 2025 11:14 AM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Subject:** RE: I Need To Speak With You As Soon As Possible

Thanks, Cheryl – I'm just out of my 10:15 meeting and heading into another...I see we are all on the calendar to meet at 2:00.

I think you are very much going to be needed as we handle the management aspects, and I'm happy to help you work through that. I did clear it with Hagana that he was ok with me talking to you about the issues he has expressed regarding Ned and LEP more broadly.

I'm sure we can get on the same page when we meet and I'm hoping we'll take away some next steps to keep this in motion.

Take care,

Claire

**From:** Cheryl Hardy <chardy1@law.upenn.edu>
**Sent:** Wednesday, October 8, 2025 10:21 AM
**To:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** RE: I Need To Speak With You As Soon As Possible

This is very important, Claire. I just left the call with Angela. She expressed that she is no longer allowed to speak with me about Hagana. She also said that you were not permitted to tell me that Hagana had spoken with you and Chris.

If you guys want to handle things that is perfectly fine with me. How you all want lo proceed. It is out of my hands.

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



---

**From:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Sent:** Wednesday, October 8, 2025 10:16 AM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Subject:** RE: I Need To Speak With You As Soon As Possible

Hi, Cheryl,

I'm in a meeting until about 11:30 and then another at noon. Are you free at 2:00?

Wish it could be sooner, but this day is busy!!

Claire

---

**From:** Cheryl Hardy <chardy1@law.upenn.edu>
**Sent:** Wednesday, October 8, 2025 10:14 AM
**To:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** I Need To Speak With You As Soon As Possible

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



# Exhibit B

**From:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Sent:** Thursday, October 9, 2025 1:01 PM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Cc:** Angela Cabrera <angelacm@law.upenn.edu>
**Subject:** Support for LEP

Dear Cheryl,

I received and have approved your request for four sick days, and hope you are doing well.  Upon your return, we'll touch base on your input and responses to Hagana's complain so that we can partner on drafting an action plan.  When you're back in the office, I'd like to also discuss the meeting we had with Angela yesterday, October 8.

Take good care of yourself and I look forward to connecting with you upon your return.


All best,


Claire



--

Claire E. Wallace  L'95

Senior Associate Dean, Academic Affairs

Penn Carey Law Registrar

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104

Registrar's Office: reg@law.upenn.edu



Exhibit C



**Absence Entries**

Hagana Kim (24896066)

Request Amount    32 Hours

Request History    Absence Request: Hagana Kim (24896066) ⋯

**Approved**

Status    Approved ⋯

Request Dates    Tue, Oct 14, 2025 – Fri, Oct 17, 2025

Type of Absence    Sick Leave ⋯

Duration per Day    8 Hours

Reason    Sick - Self ⋯

Comment    Hi Cheryl, I need a break for my mental well-being and at Angela's suggestion, I am requesting a short leave of a week. I'll make sure that Shahin and Fedieson have what they need to continue producing next week in my absence, nothing else should be affected.

Cancel Absence        Edit

Exhibit D

**From:** Cheryl Hardy
**Sent:** Sunday, October 12, 2025 10:52 AM
**To:** Angela Cabrera <angelacm@law.upenn.edu>; Christopher Wailoo <wailoo@law.upenn.edu>
**Cc:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** RE: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification

Dear Angela,

Prior to you submitting an unauthorized "proactive" FMLA request, I had requested the four (4) days of FMLA that I thought I needed to manage my condition. These days were approved by Claire Wallace in Workday, which was, and is, clearly visible to you, and confirmed via an email from Claire Wallace on which you were copied.

By "we", are you stating that you and Christopher Wailoo were acting "proactively" in submitting the extended FMLA and delegating you and Claire Wallace my managerial responsibilities in Workday, further comprising my ability to

maintain my physical health and well-being and removing my ability to manage my chronic autoimmune condition by using my FMLA as needed? I am fully aware of my rights and responsibilities regarding FMLA, which has absolutely nothing to do with my filing a complaint.

You, I am using "you" in both the singular and plural here, since I am not certain if your "we" is referencing both you and Christopher Wailoo, submitted a request in Workday placing me on FMLA from 10/09 – 10/31/25. This was an unauthorized action. I did not request this FMLA time and by way of email Friday, October 10, 2025, 5:48pm, Claire Wallace, when asked if she made these requests replied, "I did not. I am copying Angela here and ask that she reply."

**Section 631.5** of the University of Pennsylvania FMLA Policy and Procedures Manual provides that:

**Employees** seeking FMLA <u>must initiate their leave through Workday</u>. . . .

**If** an Employee is **unable to make the request** on his/her own or unable to complete all or part of the two step FMLA application process, **the employee's supervisor may** complete one or more steps on the employee's behalf, <u>upon request of the employee</u> or the employee's representative (emphasis added).

Overruling the four days that I had submitted, an unauthorized request was submitted extending my leave from 10/09 – 10/31, an unauthorized action in contravention of **Section 631.5** of the University of Pennsylvania FMLA Policy and Procedure Manual and making Central HR complicit in your actions and interfering with my ability to manage my giant cell arteritis via taking sick days when I may need them.

You, again, "you" is being used both singularly and plurally here, then went into Workday overriding protocol and security and delegating Angela Cabrera and Claire Wallace my managerial Workday responsibilities and making Ian Semmler complicit in your actions. This was an unauthorized action. I was not, and I am not, by any means incapacitated and would not be out for a long duration of time. In fact, I will be returning to work tomorrow, Monday, October 13, 2025. Claire Wallace likewise indicated that she did not authorize this action:

*From: Claire E. Wallace <cwallac2@law.upenn.edu>*
*Sent: Friday, October 10, 2025 5:51 PM*
*To: Cheryl Hardy <chardy1@law.upenn.edu>*
*Subject: Re: Workday Delegated Tasks Update*

*I got notice from Ian that I was your delegate.*

*Claire*

*\*enviado de mi iphone\**

*On Oct 10, 2025, at 4:49 PM, Cheryl Hardy <chardy1@law.upenn.edu> wrote:*

*Hi Claire,*

*Did you also process a request to have you and Angela placed as delegates in Workday on my behalf, as I did not. Workday requires that **I** delegate my tasks by following these steps:*

*To delegate tasks in Workday, navigate to your tasks or inbox, select "Manage Delegations," and click "New" or "Manage Delegations" to set up a new delegation. You must specify a delegate, a start date, and an end date, and then choose what tasks the delegate can perform, such as "Start on my behalf" or "Do my inbox tasks". It is best practice to set a specific end date, and all delegations must be approved by a Security Partner.*

## Step-by-step guide

1. ***Access delegation settings**: Go to your Workday inbox, click the dropdown menu in the top right corner, and select "Manage Delegations".*

1. ***Initiate a new delegation**: Click on the "Manage Delegations" button to create a new one.*

1. ***Set a date range**: Enter a "Begin Date" and a mandatory "End Date" for the delegation.*

1. ***Choose a delegate**: Search for and select the employee who will be taking over your tasks.*

1. ***Specify task permissions**:*

    1. ***Start on My Behalf**: Choose specific tasks the delegate can initiate on your behalf, like creating an expense report.*

    2. ***Do Inbox Tasks on My Behalf**: Select "For All Business Processes" or choose specific business processes for the delegate to complete in their inbox.*

1. ***Set retention of access**: Decide whether you want to "Retain Access" to the delegated tasks.*

1. ***Submit for approval**: Click "Submit" to send the delegation request for approval.*

## Important considerations

1. ***Approval**:*

    *All delegations must be approved by a UPenn Security Partner, and delegations lasting more than a year require extra approval.*

2. ***Best practices**:*

*Always include an end date for delegations and ensure the delegate is in a similar or higher position of*
*authority.*

3. *Functionality:*

   *Delegation is temporary and does not remove responsibility from you as the original task owner.*

4. *Security:*

   *Be mindful of the level of access you grant to avoid fraud or compliance issues.*


*<u>I did not take any of these steps,</u> but someone must have.  I have never delegated my supervisory responsibilities in
Workday.  Sick or not, I have never, not once, not fulfilled my supervisory tasks in Workday.*


As I have continued to state - I did not take these steps.  Further, if my tasks were to be delegated, they must be
delegated to someone higher than myself, in this case it would have been Claire Wallace and Polk Wagner, to whom I
report.  I could not delegate my tasks to Angela Cabrera.  Continuity was never in jeopardy,  since I would not be out
for any duration of time and can approve time off requests and hours.


Your actions are further jeopardizing my physical health and wellbeing.


Best,

Cheryl


Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104





**From:** Angela Cabrera <<u>angelacm@law.upenn.edu</u>>
**Sent:** Saturday, October 11, 2025 9:41 AM
**To:** Cheryl Hardy <<u>chardy1@law.upenn.edu</u>>
**Cc:** Claire E. Wallace <<u>cwallac2@law.upenn.edu</u>>

**Subject:** RE: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification

My apologies, Cheryl, I forgot to respond to the Hagana question.

Yes, Hagana was informed of his rights and responsibilities under the Family and Medical Leave Act (FMLA) at the time his PTO was requested.

Angela M. Cabrera

Executive Director, Human Resources

University of Pennsylvania Carey Law School

---

**From:** Angela Cabrera
**Sent:** Saturday, October 11, 2025 9:30 AM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Cc:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** RE: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification

Dear Cheryl,

Thank you again for your message and for clarifying the nature of your recent absence.

Based on the information you shared regarding the use of four sick days, and in the absence of a need for extended leave, we will proceed with withdrawing the FMLA request that was initiated. This withdrawal will be reflected in Workday.

The request was submitted proactively to ensure your rights under the Family and Medical Leave Act were protected, should the situation have required it. Our intent was to support you and ensure operational continuity—not to make assumptions about your leave duration.

Given your mention during Thursday's meeting of possibly taking leave and filing a complaint, we wanted to ensure you had access to all relevant information and resources. If at any point FMLA becomes applicable, we are here to assist with the process and ensure compliance with University policy.

I'm happy to connect next week if you'd like to discuss this further or if there's anything else I can do to support you.

Have a great weekend,

Angela.


Angela M. Cabrera

Executive Director, Human Resources

University of Pennsylvania Carey Law School

---

**From:** Cheryl Hardy <chardy1@law.upenn.edu>
**Sent:** Friday, October 10, 2025 8:31 PM
**To:** Angela Cabrera <angelacm@law.upenn.edu>
**Cc:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** Re: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification


Dear Angela,


My four sick days were noted in Workday and confirmed in Claire's email. I do not understand how this was missed and your stating you are just noting this now.


I was completely aware that three or more days sick days now require FMLA and submitted the required forms to my treating physician for completion.


I do not understand why a request of 10/9 - 10/31 was submitted. To confirm, you initiated a request for FMLA for this duration of time.


Claire - since you approved Hagana's request for 4 days off, was Hagana made aware that his request must be treated as FMLA and required treating physician forms must be completed to ensure that we are in compliance with University requirements and procedures?


As to the delegation, thank you for removing.


Best,

Cheryl

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



**From:** Angela Cabrera <angelacm@law.upenn.edu>
**Sent:** Friday, October 10, 2025 7:51 PM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Cc:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** RE: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification

Hi Cheryl,

Thank you for reaching out and sharing your concerns.

To clarify, the delegation was initiated to ensure that Julia's timesheets were approved in your absence, in line with compliance requirements discussed in previous Director's meetings and recent communications. This step was taken solely to maintain continuity and ensure timely approval of hourly time entries.

Regarding the FMLA request: it was submitted because your sick leave request exceeded three consecutive days, which automatically triggers an FMLA review under University policy. Based on your note below indicating a return next Wednesday, the delegation will be removed, and the FMLA request will no longer be necessary once your physician's documentation is received and the dates are updated accordingly.

I understand this situation may have caused confusion, and I appreciate your patience as we work through it. Please don't hesitate to reach out if you have any further questions or would like to discuss this in more detail.

Best regards,

Angela

Angela M. Cabrera

Executive Director, Human Resources

University of Pennsylvania Carey Law School

---

**From:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Sent:** Friday, October 10, 2025 5:50 PM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Cc:** Angela Cabrera <angelacm@law.upenn.edu>
**Subject:** Re: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification

Hi - again I think Angela can address this.

Best,

Claire

*enviado de mi iphone*

> On Oct 10, 2025, at 4:38 PM, Cheryl Hardy <chardy1@law.upenn.edu> wrote:
>
> Hi Claire,
>
> Did you put through additional sick days for me? I requested four sick days for 10/9, 10/10, 10/13, 10/14 and I have submitted the required paperwork to my physician for those days.
>
> I received the below from Penn HR FMLA notifying me that my sick days would run from **10/9** through **10/31**. I did not request this amount of time off. When connecting with Dawn Lewis in Penn HR-FMLA, she indicated that someone must have requested these days:
>
> *Someone had to request the FMLA days, which means if you did not, your manager or someone else in the department requested the FMLA time.*

I told her, I did not.  I only requested the four (4) days.  She is not sure of why the days are off as she did not process that request.


Dawn has advised me that once my paperwork comes in the dates will be updated appropriately and only the requested dates will be entered.


Best,

Cheryl



Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



**From:** HR FMLA <HRFMLA@hr.upenn.edu>
**Sent:** Friday, October 10, 2025 10:58 AM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Subject:** RE: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification



Once the completed paperwork is received the dates will be updated appropriately.  We only enter the requested dates so I am not sure since I did not process the leave request.



Thanks,

Dawn Lewis

Senior Benefits Specialist, FMLA/STD

Division of Human Resources

University of Pennsylvania

600 Franklin Building |3451 Walnut Street | Philadelphia, PA 19104 - 6205

Phone: 215-898-7286

Fax: 215-405-2929

Email: dawnlew@upenn.edu

URL: www.hr.upenn.edu

 Before printing this email, be sure it's necessary. *Stop. Think. Recycle.*

**From:** Cheryl Hardy <chardy1@law.upenn.edu>
**Sent:** Friday, October 10, 2025 10:54 AM
**To:** HR FMLA <HRFMLA@hr.upenn.edu>
**Subject:** Re: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification

Hi Dawn,

I see. Yes, I requested four sick days, yesterday and today and Monday 10/13 and Tuesday 10/14.  It is my hope to return on Wednesday.  My doctor will be submitting  the required forms to cover those days.

I was thrown off because I only requested four days, so I did not understand why the email states from 10/9 through 10/30.  Is this how it is done?  I have to be out until 10/30?

Thanks Dawn,

Cheryl

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



---

**From:** HR FMLA <HRFMLA@hr.upenn.edu>
**Sent:** Friday, October 10, 2025 10:01 AM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Subject:** RE: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification

Cheryl,
 Penn Policy indicates if you are using more than 3 consecutive sick days, you are required to request FMLA and submit the required paperwork. Someone had to request the FMLA days, which means if you did not, your manager or someone else in the department requested the FMLA time.

Thanks,

Dawn Lewis
Senior Benefits Specialist, FMLA/STD
Division of Human Resources
University of Pennsylvania
600 Franklin Building |3451 Walnut Street | Philadelphia, PA 19104 - 6205
Phone: 215-898-7286
Fax: 215-405-2929
Email: dawnlew@upenn.edu
URL: https://nam02.safelinks.protection.outlook.com/?
url=http%3A%2F%2Fwww.hr.upenn.edu%2F&data=05%7C02%7Cchardy1%40law.upenn.edu%7
C81271a37a64540bb6b6508de08059339%7C6cf568beb84a4e319df6359907586b27%7C0%7C0
%7C638957017208576526%7CUnknown%7CTWFpbGZsb3d8eyJFbXB0eU1hcGkiOnRydWUsIlYiO
iIwLjAuMDAwMCIsIlAiOiJXaW4zMiIsIkFOIjoiTWFpbCIsIldUIjoyfQ%3D%3D%7C0%7C%7C%7C&sd
ata=0R3pOnx0fvLOng0mxxbceToHe8YPH2zNUhnnR6xkHLQ%3D&reserved=0

Π Before printing this email, be sure it's necessary. Stop. Think. Recycle.

-----Original Message-----
From: Cheryl Hardy <chardy1@law.upenn.edu>
Sent: Friday, October 10, 2025 10:00 AM
To: HR FMLA <HRFMLA@hr.upenn.edu>
Subject: RE: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification

Hi,

I do not understand why I am receiving the below email.  I did not request FMLA from 10/09/2025 to 10/31/2025.  I requested four (4) sick days, 10/9, 10/10, 10/13 and 10/14.

An alert came up on Workday that sick days in excess of three days must now be considered under FMLA, is this correct.

Again, I only requested four sick days with the hope of returning to work next week.

Please advise on next steps.

Thanks,
Cheryl Hardy


Cheryl D. Hardy, L'94
Associate Dean, Professional Engagement
& Strategic Initiatives, Legal Education Programs University of Pennsylvania Carey Law School
3501 Sansom Street, Philadelphia, PA 19104



-----Original Message-----
From: leavesource-email@leavesource.com <leavesource-email@leavesource.com> On Behalf Of fmla@hr.upenn.edu
Sent: Friday, October 10, 2025 9:39 AM
To: Cheryl Hardy <chardy1@law.upenn.edu>; Cheryl Hardy <chardy1@law.upenn.edu>
Subject: Hardy, Cheryl - 66538572 : FMLA Leave Leave Notification

[This sender might be impersonating a domain that's associated with your organization. Learn why this could be a risk at https://nam02.safelinks.protection.outlook.com/?url=https%3A%2F%2Furldefense.com%2Fv3%2F__https%3A%2F%2Faka.ms%2FLearnAboutSenderIdentification__%3B!!IBzWLUs!Suudiomlk-c8Af3YLpvXZaCwFvGtfueUucjOlXQIeRktT9CabTmfDjoyDMiX1VgwKfz3Xh4ZlbIdXRbMZ9ik5w%24&data=05%7C02%7Cchardy1%40law.upenn.edu%7C81271a37a64540bb6b6508de08059339%7C6cf568beb84a4e319df6359907586b27%7C0%7C0%7C638957017208625466%7CUnknown%7CTWFpbGZsb3d8eyJFbXB0eU1hcGkOnRydWUsIIYiOiIwLjAuMDAwMCIsIIAiOiJXaW4zMiIsIkFOIjoiTWFpbCIsIldUIjoyfQ%3D%3D%7C0%7C%7C%7C&sdata=J3BbPZhMuppu%2F0utXfDx%2BnbUsyD9s45fEhXTXBr5DH0%3D&reserved=0 ]

CAUTION:This message was sent from outside your organization. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

October 10, 2025

Re: FMLA Eligibility for Cheryl Hardy

Dear Cheryl,

We have been notified of your need to take a Federal FMLA leave of absence from work. You have reported your anticipated leave dates as 10/09/2025 thru 10/31/2025.

You are eligible for the following leave types as of the start date of your leave:  Serious Health Condition -  Self.

To help us complete our review of your request for an FMLA leave of absence, you have up to 15 days from the date of this letter to complete and return the required medical certification(s) to us. **If you have already submitted your paperwork, you do not need to take any further action at this time.** The certification(s) must be emailed to fmla@hr.upenn.edu or faxed to (215) 405-2929. If the paperwork is not received by this due date, it will result in denial of your request for an FMLA leave of absence. Please be sure to review the attached Employee Rights and Responsibilities under the Family and Medical Leave Act for more details.

It is important to note that being eligible for a leave is not the same as being approved for a leave of absence. Your request will remain in a pending status until we receive the required medical certification form(s) by the deadline stated above. It is your responsibility to ensure we receive the required forms by the due date.

What happens next?
You will receive a claim decision from our office via both email and USPS mail. If we need additional information, we will let you know.

If anything changes in your status or the dates associated with your requested leave of absence, you are required to notify us as soon as possible. This includes any new return to work dates or extension requests that differ from the original request.

Should you have any questions regarding your leave of absence request, please email our office at fmla@hr.upenn.edu.

Sincerely,

FMLA Leave Administrators

# Exhibit E

**From:** Cheryl Hardy
**Sent:** Friday, October 10, 2025 6:15 PM
**To:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** RE: Workday Delegated Tasks Update

I also noticed that someone has gone in and approved the sick days that Hagana requested.  Did you approve the request as a delegate?  It is no longer in my Workday Inbox.

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



**From:** Cheryl Hardy
**Sent:** Friday, October 10, 2025 6:06 PM
**To:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Subject:** RE: Workday Delegated Tasks Update

Someone had to request this a put this through.  It requires security overrides.   This is highly unethical.

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104

**From:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Sent:** Friday, October 10, 2025 5:51 PM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Subject:** Re: Workday Delegated Tasks Update

I got notice from Ian that I was your delegate.

Claire

*enviado de mi iphone*

On Oct 10, 2025, at 4:49 PM, Cheryl Hardy <chardy1@law.upenn.edu> wrote:

Hi Claire,

Did you also process a request to have you and Angela placed as delegates in Workday on my behalf, as I did not.  Workday requires that I delegate my tasks by following these steps:

To delegate tasks in Workday, navigate to your tasks or inbox, select "Manage Delegations," and click "New" or "Manage Delegations" to set up a new delegation. You must specify a delegate, a start date, and an end date, and then choose what tasks the delegate can perform, such as "Start on my behalf" or "Do my inbox tasks". It is best practice to set a specific end date, and all delegations must be approved by a Security Partner.

## Step-by-step guide

1. **Access delegation settings**: Go to your Workday inbox, click the dropdown menu in the top right corner, and select "Manage Delegations".

1. **Initiate a new delegation**: Click on the "Manage Delegations" button to create a new one.

1. **Set a date range**: Enter a "Begin Date" and a mandatory "End Date" for the delegation.

1. **Choose a delegate**: Search for and select the employee who will be taking over your tasks.

1. **Specify task permissions**:

    1. **Start on My Behalf**: Choose specific tasks the delegate can initiate on your behalf, like creating an expense report.

    2. **Do Inbox Tasks on My Behalf**: Select "For All Business Processes" or choose specific business processes for the delegate to complete in their inbox.

1. **Set retention of access**: Decide whether you want to "Retain Access" to the delegated tasks.

1. **Submit for approval**: Click "Submit" to send the delegation request for approval.

## Important considerations

1. **Approval**:

    All delegations must be approved by a UPenn Security Partner, and delegations lasting more than a year require extra approval.

2. **Best practices**:

    Always include an end date for delegations and ensure the delegate is in a similar or higher position of authority.

3. **Functionality**:

   Delegation is temporary and does not remove responsibility from you as the original task owner.

4. **Security**:

   Be mindful of the level of access you grant to avoid fraud or compliance issues.

<u>I did not take any of these steps</u>, but someone must have.  I have never delegated my supervisory responsibilities in Workday.  Sick or not, I have never, not once, not fulfilled my supervisory tasks in Workday.

I tried to contact you by phone twice, but my calls went to your voicemail.

Best,
Cheryl

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104

<image001.png>

**From:** Workday@Penn <upenn@myworkday.com>
**Sent:** Friday, October 10, 2025 1:59 PM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Subject:** Workday Delegated Tasks Update

The following delegation has been approved:

Delegate: Claire Wallace

Begin Date: 10/10/2025

End Date: 10/31/2025

All Business Processes: Yes

Specific Business Processes: ...

Retain Access to Delegated Tasks: Yes

Click here

This email was intended for chardy1@law.upenn.edu · Manage Preferences
University of Pennsylvania · Philadelphia, PA

Exhibit F

2:40



‹ 4

Claire ›

We are at the table...
Courtyard over by The Clock.

I would speak with you as
soon as possible.

Fri, Oct 10 at 5:19 PM

Hi **Claire**, I sent you two emails
with questions. Best, Cheryl.

Hi Cheryl – I will look at your
emails soon. Hope all is well.
Claire

I've copied Angela on your
messages. I think she can best
answer the FMLA and Workday
delegation. I have not submitted
anything other than what came
in to my inbox today – Hagana's
requested time off and I see
Julia's time sheet is in. I will go
ahead and approve that as well.
Let me know if you have any
questions and I wish you a
speedy recovery. Claire

Did you authorize Angela to
request additional sick days
that I did not request?  Did you
authorize Angela to go in and
delegate my tasks to you?

Read 10/10/25

 iMessage

Exhibit G

**Subject:** Fwd: Formal Grievance

**Date:** Wednesday, February 4, 2026 at 8:53:48 PM Eastern Standard Time

**From:** Cheryl Hardy <cnc1233@gmail.com>

**To:** Robert Vance <rvance@vancelf.com>

**Attachments:** image001.png

Exhibit J

---------- Forwarded message ---------
From: **Cheryl Hardy** <chardy1@law.upenn.edu>
Date: Fri, Oct 10, 2025 at 8:33 AM
Subject: Formal Grievance
To: Carrington, Lynnea N <lynnea@upenn.edu>
Cc: Cheryl Hardy <cnc1233@gmail.com>

Dear Ms. Carrington,

Unfortunately, I find myself in a tenuous position where I feel I have no recourse but to file a formal complaint against my manager, Claire Wallace, Senior Associate Dean of Academic Affairs and Registrar, Angela Cabrera, Director of Human Resources, and her manager, Christopher Wailoo, Associate Dean and CFO.

I am very concerned with retaliation as I report directly to Claire Wallace, I have reclassifications and actions that are before, Angela Cabrera, and Chris Wailoo has direct oversight over my budget and resources.

After a contentious conversation with Claire Wallace and Angela Cabrera at 2:00 pm, this past Tuesday, October 8, I am taking four sick (4) days to pull myself together, which now requires FMLA. I have a stress induced autoimmune condition known as giant cell arteritis, a condition that is exacerbated and flairs up when I am under a tremendous amount of stress. My condition places me at risk of vision loss, aneurisms, and stroke. I was diagnosed with this condition just over a year and a half ago, April 2024. I am currently under the care of a physician, Dr. Colin Ligon, M.D., Rheumatologist, Penn Medicine Valley Forge, and I am currently taking medication to manage my condition. I have taken the required FMLA forms to Dr. Ligon's office and have asked that he complete the forms and submit the forms to fax number as indicated. I was advised by the administrator that this might take several days to complete but the forms will be completed and sent in.

I have copied my personal email address, and my phone number is 484-431-5552.

I am very unfamiliar with these processes and not familiar with how things work.

Best regards,

Cheryl Hardy

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



Exhibit H

# Family and Medical Leave (FMLA)

Eligible employees may be entitled to leave under the federal Family and Medical Leave Act (FMLA) for specified family and medical reasons.

## 631.2 ELIGIBILITY

To be eligible for FMLA benefits, an employee must have been employed by the University for at least twelve (12) months and have worked for at least 1,250 hours during the 12-month period immediately preceding the start of the leave. Periods of approved military leave should be counted when calculating these hours of service requirements for FMLA leave. The employee must also be employed at a worksite of the University where 50 or more employees are employed by the University within 75 miles of that worksite.

## 631.3 QUALIFIED LEAVE REASONS

The University will grant FMLA leave to eligible employees for the following reasons:
1. The employee's serious health condition;
2. The birth and care of the employee's child;
3. Placement with the employee of a child for adoption or foster care;
4. Care of the employee's spouse, child, or parent with a serious health condition;
5. Because of a "qualifying exigency" relating to the active-duty status or call to active-duty in the armed forces of a spouse, son, daughter, or parent of the employee, including those contingencies set forth in the applicable regulations, summarized as follows:

   a.  short-notice deployment;
   b.  military events and related activities;
   c.  to arrange for childcare, or provide childcare on an urgent basis, or for school activities;
   d.  to make financial or legal arrangements;
   e.  to attend counseling;
   f.  to spend time with the service member while on short-term leave;
   g.  for post-deployment activities; and
   h.  for other activities in accordance with the regulations.

6. Because care is required for a family member or next of kin who is a covered service member (i.e., member of the U.S. armed forces, National Guard or Reserves) who is undergoing medical treatment, recuperation, or therapy, or is otherwise in outpatient status on the temporary disability retired list, for a serious injury or illness.

Leave for the birth and care, or placement and care of a child must conclude within twelve (12) months of the birth or placement of the child. FMLA applies equally to male and female employees.

## 631.4 DEFINITIONS

1.  **Employee** means faculty or staff member employed by the University on a full time, part time or temporary basis.

2.  **Serious Health Condition** means an illness, injury, impairment, or physical or mental condition that involves either:

    a.  inpatient care in a hospital, hospice or residential medical care facility, or

    b.  continuing treatment by a health care provider.

3.  **Continuing treatment** means, in broad terms:

    a.  A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment thereof, or recovery there from) of more than three (3) consecutive calendar days (and any subsequent treatment or period of incapacity involving the same condition) involving treatment two (2) or more times by a health care provider—within thirty (30) days of the incapacity—or treatment by a health care provider on at least one occasion that results in a regimen of continuing treatment under the health care provider's supervision.

    b.  Any period of incapacity due to pregnancy or prenatal care.

    c.  Any period of incapacity or treatment for such incapacity due to a chronic serious health condition that requires periodic visits for treatment by a health care provider; continues over an extended period of time; and may cause episodic rather than continuing incapacity (e.g., asthma, diabetes, epilepsy, etc.).

    d.  A period of incapacity that is permanent or long-term due to a condition for which treatment may not be effective (e.g., Alzheimer's, severe stroke, terminal stages of a disease).

    e.  Any period of absence to receive multiple treatments by a health care provider either for restorative surgery after an accident or injury or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment (e.g., chemotherapy for cancer, physical therapy for severe arthritis, or dialysis for kidney disease).

4.  **Parent** means the biological [or adoptive] parent of an employee or an individual who stands or stood in the place of a parent to an employee when the employee was a child.

5.  **Child** means a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing in the place of a parent who is under eighteen (18) years of age or 18 years of age or older and incapable of self-care because of a mental or physical disability.

6.  **Health care provider** means a physician, dentist, podiatrist, clinical psychologist, or optometrist who is authorized to practice medicine or surgery in the state in which the individual practices his/her profession. In cases limited to treatment consisting of manual manipulation of the spine to correct a subluxation, medical certification may be provided by a chiropractor.

7.  **Next of kin** means nearest blood relative.

8. **Covered service member** means a member of the United States Armed Forces, National Guard or...

Case 2:26-cv-00849  Document 1  Filed 02/09/26  Page 58 of 80

9. **Serious injury or illness** means an injury or illness incurred by a covered service member in the line of duty on active duty that may render him or her unfit to perform the duties of his or her office, grade, rank, or rating.

## 631.5 APPLICATION PROCESS

Employees seeking FMLA leave must initiate their leave through Workday. For step-by-step instructions, visit the Workday website and access the Workday tip sheet, Self-Service: Self-Service: Request Leave of Absence.

Upon the submission of a leave request, Workday will issue a notification to the employee. This notification will include a direct link to the pertinent medical forms required for the leave.

If an employee is unable to make the request on his/her own or unable to complete all or part of the two-step FMLA application process, the employee's supervisor may complete one or more steps on the employee's behalf, upon request of the employee or the employee's representative.

Employees using intermittent leave or leave on a reduced schedule must make a reasonable effort to avoid disrupting University operations, including scheduling doctor's appointments outside of work hours. An employee using intermittent leave must, on a continuing basis, enter the intermittent leave time in Workday by entering the hours in the "Request Time Off" application after the employee has been approved for FMLA Intermittent leave.

Failure to follow this policy may delay or postpone the commencement of the FMLA leave and/or result in disciplinary action.

## 631.6 NOTICE TO EMPLOYEE

After an employee has requested an FMLA leave in Workday the FMLA Administrator will provide the employee with a written Notice of Eligibility and Rights and Responsibilities and any other pertinent information concerning the status of the FMLA leave.

## 631.7 CERTIFICATION BY HEALTH CARE PROVIDER

If FMLA leave is based on a serious health condition, whether it involves the employee or a family member (parent, spouse, or child), medical certification from a health care provider will be required and must be submitted to the FMLA Administrator. Failure to provide such certification to the FMLA Administrator may result in a delay or denial of the employee's request for leave. Where a medical certification is required, that certification must be provided within fifteen (15) calendar days of the leave request. Employees should be aware that, under certain circumstances, a recertification may be required. In addition, employees may be required to report on their intent to return to work. Finally, if the anticipated duration of an employee's FMLA leave changes (e.g., due to a change in the employee's health condition or other circumstances), the employee is required to notify the FMLA Administrator promptly (i.e., within two business days) of this change.

If an FMLA leave request is based on a qualifying exigency due to active duty service or a call to active-duty service, the employee may be required to provide a copy of the active-duty order or other appropriate documentation, as well as certification and documentation from the employee containing information supporting the qualifying exigency. When leave is taken to care for a covered service member, the employee may be required to provide certification from an authorized health care provider.

Employees using FMLA leave of any kind are prohibited from performing University work either in the workplace or at any other location, including the employee's home; the prohibition on working while on FMLA leave also applies to work performed for other employers, except in limited circumstances. When returning to work from an FMLA leave taken because of the employee's own serious health condition, the employee will be required to provide a return to work note from the employee's health care provider to the FMLA Administrator prior to reporting back to the workplace.

## 631.8 LENGTH OF LEAVE

Eligible employees may be entitled to up to twelve (12) weeks of unpaid FMLA leave during any rolling 12-month period (which period is measured backward from the date an employee uses any FMLA leave). Each time an employee takes FMLA leave, the remaining leave entitlement equals the balance of the 12 weeks that has not been used during the immediately preceding twelve (12) months.

An eligible employee who is the spouse, son, daughter, parent, or next of kin of a covered service member shall be entitled to a total of (26) workweeks of FMLA leave during a 12-month period to care for the service member. The leave in this paragraph shall only be available during a single 12-month period, though that leave entitlement shall be applied on a per-covered-service member, per-injury basis.

In certain circumstances, employees may take intermittent FMLA leave or FMLA leave on a reduced leave schedule. Intermittent leave or leave on a reduced schedule may be taken only if medically necessary to care for a seriously ill family member or because of the employee's own serious health condition. Intermittent leave or leave on a reduced schedule to care for a child following its birth or placement for adoption or foster care will be allowed based on business needs and only with prior written approval, which will be provided by the FMLA Administrator.

Where both spouses are employed by the University, they are each entitled to twelve (12) weeks of FMLA leave for the birth and care of their newborn child, or for the care and placement with them of a child for adoption or foster care. However, if the employee takes leave under the University's Sick Leave, Paid Parental Leave, Paid Time Off and/or Short-Term Disability programs in these circumstances, the twelve (12) weeks of unpaid FMLA will run concurrently with any leave taken under any of these programs.

## 631.9 THE INTERPLAY BETWEEN PAID LEAVE AND FMLA LEAVE PERIODS

In all circumstances necessitating a leave, employees will use paid sick leave and paid time off (PTO) for which the absence qualifies and will also be expected to apply for any Short-Term Disability (Policy 404), Long-Term Disability (Policy 405) or Workers' Compensation benefits to which they are entitled during the leave (as determined under the terms of those programs). The employee's sick leave, PTO and any STD/LTD/WC benefit periods will run concurrently with the days as to which an employee's FMLA leave entitlement applies. In other words, paid leave is substituted for unpaid leave and will be counted toward the twelve (12) weeks of FMLA leave.

## 631.10 BENEFITS DURING LEAVE

During any FMLA leave, the University will maintain the employee's medical, dental, vision, life and disability insurance coverage on the same conditions that coverage would have been provided if the employee had been continuously employed during the entire leave period. The University and the employee will each continue to pay their portion of the benefit costs. In some instances, the University may recover premiums (on a prorated basis) it had paid to maintain health coverage for an employee who fails to return to work from FMLA leave.

During an FMLA leave, accrued and unused vacation will accrue during that portion of the leave which paid by using sick leave or PTO during any unpaid FMLA leave, or during a period of Short-Term Disability, Long-Term Disability or Workers' Compensation, sick leave and PTO will not accrue. Where the FMLA leave is taken on an intermittent basis or as a reduced-schedule, sick leave and PTO will continue to accrue during the leave on a prorated basis.

## 631.11 RETURN FROM LEAVE

Normally, employees returning from FMLA medical leave will be reinstated to the same or an equivalent position, with equivalent pay, benefits and other terms and conditions of employment. Failure to return to work if the employee no longer qualifies for FMLA leave (or another type of permissible leave) may result in termination of employment. However, at times, departments, schools and/or centers may restructure due to changing business and operational needs and the need to continually enhance programs and services. These restructuring initiatives may result in position discontinuations or terminations, even positions held by employees out on FMLA leave. If a staff member on FMLA leave has his/her position discontinued, the employee will be given at least thirty (30) days written notice of the position discontinuation and will be informed of any applicable benefits that the employee may be eligible to receive under the Position Discontinuation and Staff Transition Program.

Employees returning from an FMLA leave for a serious health condition or pregnancy must provide the FMLA Administrator with a signed doctor's note on letterhead documenting their fitness to return to work. Employees who are unable to return to work at the end of the approved FMLA leave should notify the FMLA Administrator at least two (2) weeks in advance (where possible) and must have the physician re-certify their medical need for continued leave.   Supervisors should contact Human Resources to discuss alternatives prior to taking any action if staff members are unable to return to work and have exhausted their approved leave.

In addition, except as provided in this policy, an employee's use of FMLA leave will not result in the loss of any employment benefit that the employee earned before using FMLA leave. Use of FMLA leave will not be counted against the employee under a "no-fault" attendance policy.

## 631.12 OTHER LEAVE ARRANGEMENTS

The determination of whether an employee qualifies for FMLA leave will be made by the FMLA Administrator. If an employee is ineligible for leave under FMLA or has exhausted his/her 12 weeks of FML leave, and is further not entitled to paid STD, LTD or Workers' Compensation leave, the employee may apply for or leave as a reasonable accommodation under the Americans with Disabilities Act (ADA) or additional leave under Policy 616 (Leave of Absence without Pay) subject to the terms of such Policy.

## 631.13 FOR MORE INFORMATION

Information can be obtained by contacting the FMLA Administrator or by seeking information from the employee's supervisor or Human Resources. In addition, a poster has been placed in Human Resources which includes further details regarding eligibility and other requirements of the law. Employees of temporary staffing agencies should contact their agency directly for information regarding their rights under the FMLA (see Policy 112, Using Temporary Agencies). Questions of interpretation under this policy will be resolved by reference to the FMLA and regulations issued by the United States Department of Labor. Employee's rights under this policy shall in no case be less than those afforded by the FMLA.

## 631.14 EMPLOYEE ASSISTANCE PROGRAM (EAP)

Dealing with issues that qualify for Family and Medical Leave (FMLA) can be challenging. Returning to work following FMLA can be stressful. For these and other matters, the University offers the Employee Assistance Program (EAP) for free, confidential, one-to-one support at any time. The EAP can be reached 24 hours a day, 7 days a week to help the employee manage the issues at hand and prepare for a successful return to the workplace.  The employee may call 1-888-503-2380 to speak with a counselor. The employee can also find useful information on the EAP website.

## 631.15 UNIVERSITY STAFF WHO ARE COVERED BY COLLECTIVE BARGAINING AGREEMENTS

University staff members who are covered by collective bargaining agreements should refer to the appropriate contract article.

## 631.16 EMPLOYEES WORKING IN OTHER JURISDICTIONS

The benefits and policies for University of Pennsylvania employees who work in locations outside of the Commonwealth of Pennsylvania may be different from the benefits and policies set forth in this website. Employees working outside the Commonwealth of Pennsylvania should contact Human Resources for more information.

Policy Number: 631
Effective Date: 07/01/2016
Last Reviewed Date:  6/17/2019
Revised Date:  07/01/2019
Supersedes Policy Number(s): 631 (Family and Medical Leave Act–02/01/1998), 631 (11/01/1998, 02/20/2002, 04/01/2009, 07/1/2015)
Applicability: All Faculty & Staff
Cross-reference: Adherence to University Policy - Policy 001, Using Temporary Agencies - Policy 112, Short-Term Disability - Policy 404, Paid Time Off (PTO) - Policy 607, Sick Leave Accrued - Policy 612, Sick Leave and STD - Policy 613,  Leave of Absence Without Pay - Policy 616, Occupational Injury or Illness - Policy 714

Policy Manual Disclaimer

Time Off

Exhibit I

**From:** Cheryl Hardy
**Sent:** Friday, October 10, 2025 8:53 PM
**To:** Sophia Lee <slee@law.upenn.edu>; R. Polk Wagner <pwagner@law.upenn.edu>
**Subject:** Filing of Formal Grievance

Dear Sophia and Polk,

Out of respect for you as the Dean of Penn Carey Law and Deputy Dean of Academic Affairs, Polk,  whom I have worked with over the past 15 years, I have come to a point where I can no longer comprise myself physically, mentally, and ethically and will be filing a formal complaint with Staff Labor and Relations against:

Claire Wallace, Senior Associate Dean Academic Affairs and Registrar

Christopher Wailoo, Associate Dean, CFO

Angela Cabrera, Director, Human Relations

The level to which Senior administrators are not held accountable for their actions and inactions continues to be par for the course and Senior Administration continues to act or not act with impunity.

My taking this action stems from a formal complaint filed by Hagana Kim against Ned Hawkins. I saw this coming and reached out to both Angela and Claire and both have been MIA. From what I have been told Hagana went to Claire on Monday, 10/6, then went to Chris Wailoo. Chris told Claire that they should loop Polk in, and Claire said No. I was summoned to a meeting on Wednesday, 9/8 at 2:00 p.m. I was not allowed and have not been allowed to see the full complaint, but I was repeatedly told that I needed to respond to four bullet points in the complaint by COB today, Friday, 9/10 without reviewing the complaint in its entirety. I have not done so. I will not be complicit in any actions taken of which I am not completely aware of and will absolutely not file a response to four bullet points that contain inaccuracies taken from what appears to be a four – five-page front and back document. I was told that my refusal to communicate and engage in the discussion would be documented and Angela Cabrera proceeded to write my refusals down on a note pad.

This was a very contentious meeting, and I left the meeting very concerned about my physical health and well-being. I have an autoimmune condition, giant cell arteritis, that requires that I temper my stress level as much as possible. I requested four (4) days sick leave in Workday and requested my treating physician to fill out the required paperwork and to submit the paperwork to the University. It is my hope to return to work on Wednesday.

Other things have also taken place over the past two days which are too much to account for here. This entire situation is being mishandled, and the actions and machinations that are occurring , and the way I am being treated is appalling. I have been crying for the past few days and every time I think about what is happening, I start to cry.

Respectfully submitted,

Cheryl

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



Exhibit J

**From:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Sent:** Sunday, October 12, 2025 7:45 PM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Subject:** Work Remotely - Monday, 10/13

Dear Cheryl,

I am requesting that you work remotely tomorrow, Monday, October 13, given the way in which our meeting with Angela transpired and concluded on Thursday, last week. I will schedule time to meet with you to discuss that meeting, and how we can continue to support LEP, later this week. In the meantime, please let me know when I can expect your responses to the examples from Hagana's complaint. Your input is important for us to be able to evaluate the appropriate action plan.

Thank you and I look forward to talking with you.

All best,

Claire

--

Claire E. Wallace  L'95

Senior Associate Dean, Academic Affairs

Penn Carey Law Registrar

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104

Registrar's Office: reg@law.upenn.edu

 Penn Carey Law
UNIVERSITY of PENNSYLVANIA

**Page 2 of 3**

Exhibit K

**From:** Cheryl Hardy
**Sent:** Monday, October 13, 2025 7:12 AM
**To:** jrow@upenn.edu <jrow@upenn.edu>; Carrington, Lynnea N <lynnea@upenn.edu>; sstarks@upenn.edu <sstarks@upenn.edu>
**Cc:** oeop@pobox.upenn.edu <oeop@pobox.upenn.edu>
**Subject:** Formal Compliant: Retaliation, Unauthorized FMLA Submission, and Interference With Supervisory Authority

Dear Central HR Executive Director, Office of Staff and Labor Relations at the University of Pennsylvania:

I am submitting this formal complaint to document and request an investigation into retaliatory and unauthorized employment actions taken against me within the University of Pennsylvania Carey Law School.

I am a 1994 alumna of the Law School and have served the Law School for over 15 years as the Associate Dean, Legal Education Programs with an unblemished record of service and leadership. However, recent actions by members of the Law School's Human Resources department and my supervisory team have created a hostile and retaliatory work environment that has caused me significant personal harm and distress.

1. **Unauthorized FMLA submission in contravention of Section 631.5 of the University of Pennsylvania FMLA Policy and Procedure Manual.**

On Friday, October 10, 2025, I received a notice through the University's Workday system from Central FMLA that a 22-day Family and Medical Leave Act (FMLA) request had been submitted and processed on my behalf, overriding a prior request for four (4) sick days that was submitted and approved. I did not initiate, authorize, or consent to this request. This request constitutes a serious violation of federal law, as well as University policy.

When I inquired about this action, I received an email from Angela Cabrera, Law School Executive Director, HR confirming that she – along with unnamed Law School parties – unilaterally and "proactively" decided to submit this request because I had mentioned filing a workplace complaint. Her email states "Given your mention during Thursday's meeting [the meeting was Wednesday, 10/8] of possibly taking leave and filing a complaint, we wanted to ensure you had access to all relevant information and resources. If at any point FMLA becomes applicable, we are here to assist with the process and ensure compliance with University policy."

This action was not only unauthorized but also misrepresented the time I would be out, seemingly intending to remove me from my professional duties, diminish my authority, and retaliate against me for expressing concerns about, harassment, coercion, and management misconduct – ultimately serving to bypass my role as part of a broader scheme.

## 2. Retaliatory Reassignment of Supervisory Duties

Following this unauthorized 22 day-FMLA submission, my Workday supervisory permissions and team management authority were reassigned to my direct supervisor, Claire Wallace and Angela Cabrera, without notice, explanation, or justification. This reassignment immediately affected the administration of my team and facilitated improper actions by Law School HR and Claire Wallace.

Specifically, my staff member Hagana Kim had submitted a formal grievance to the Law School HR department. Shortly thereafter, Hagana Kim submitted a Workday request for one week's leave of absence. In the comment section of the Workday submission, Hagana Kim noted that at the suggestion of Angela Cabrera, he would be taking the following week off – a request that Claire Wallace subsequently approved in Workday once my supervisory permissions had been reassigned following the unauthorized 22-day FMLA trigger.

This sequence of events demonstrates a deliberate circumvention of my supervisory role in and effort to manipulate internal reporting lines during a period of active grievances. The unilateral reassignment of my supervisory authority undermines my professional position, disrupts the established chain of command, and materially interferes with my ability to perform my duties as Associate Dean.

The timing – occurring immediately after I indicated my intent to raise a formal workplace complaint- further evidences a retaliatory motive and suggests a coordinated effort to exclude me from critical oversight responsibilities and decision-making processes related to my team.

## 3. Retaliatory Context

When I raised concerns about misconduct and indicated that I was considering filing a formal complaint, I believe my supervisor and the Law School HR representative took these steps to intimidate and silence me.

4.  Formal Complaint and Preservation of Rights

I submit this correspondence as a formal complaint of retaliation, coercion, harassment, and unlawful employment interference.  The actions described above - including the unauthorized submission of a 22-day FMLA request, the subsequent reassignment of my supervisory authority, and the circumvention of established reporting lines – constitute serious breaches of University policy and potential violations of federal and state law.

I respectfully request that the University acknowledge receipt of this complaint and provide written confirmation of the next steps and investigative process.  I further request that any an all records associated with these actions be preserved in their entirety.

This complaint is submitted in good faith and with a commitment to ensuring a fair, transparent, and lawful resolution consistent with University policy and the protections afforded under the Family and Medical Leave Act (FMLA) and Title VII of the Civil Rights Act of 1964.

Sincerely,

Cheryl Hardy

Cheryl D. Hardy, L'94

Associate Dean, Professional Engagement

& Strategic Initiatives, Legal Education Programs

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104



Exhibit L

**From:** Claire E. Wallace <cwallac2@law.upenn.edu>
**Sent:** Monday, October 13, 2025 8:54 AM
**To:** Cheryl Hardy <chardy1@law.upenn.edu>
**Subject:** Paid Administrative Leave - effective immediately

Dear Cheryl,

Following recent events and your decision to disregard my request to work remotely today, we have determined that, in light of the nature of your behavior and the concerns raised in our meeting with Angela Cabrera on Thursday, October 9, it is necessary to place you on an immediate leave of absence with pay while we continue to review the matter.

During this period, you will be temporarily relieved of your duties.
You will receive further communication from us outlining the next steps and any additional

information required during this time.

If you have any questions or need further clarification, please reach out to me. We will do our best to keep you updated.

We appreciate your cooperation and understanding during this time.

Best regards,

Claire Wallace

*enviado de mi iphone*

Exhibit M

---------- Forwarded message ---------
From: <myPennMedicineInfo@uphs.upenn.edu>
Date: Tue, Oct 14, 2025 at 9:57 AM
Subject: New letter in myPennMedicine
To: <cnc1233@gmail.com>



Hello Cheryl Hardy ,

You have a new letter in MyChart by myPennMedicine! Please sign in to
read your letter.

**Sign In Now**

MyChart by myPennMedicine is available on the go!

 

Name: Cheryl D Hardy | DOB: ▓▓▓▓ | MRN: ▓▓▓▓ | PCP: Cindy Iglesias, MD | Legal Name: Cheryl D Hardy

 Penn Medicine

Division of Rheumatology
Colin Ligon, MD, MHS

Re: Cheryl Hardy
DOB: ▓▓▓▓


To Whom It May Concern:

Ms. Cheryl Hardy is a patient of mine followed in the Penn Rheumatology Clinic at Valley Forge, last seen 09/10/2025. She is being managed on immunosuppressive medications for an autoimmune condition which has the potential to cause blindness, strokes, and death if left untreated. She is doing well on chronic medication management, but her treatment requires regular in-person evaluations usually once every three months, as well as monitoring lab work also every 3-6 months to monitor disease activity and medication safety. Because her medications weaken her immune system, it is important for her to be able to receive appropriate vaccinations as well. Her disease is under control with treatment, but flares of her immune condition are common and may still occur up to once a month, with flares usually causing headaches, fatigue, and joint pain and swelling, taking usually not more than 3 days to control with additional urgent medication. While this condition tends to improve with treatment extended over a few years, she will warrant medical followup potentially for the rest of her life even if she can be weaned off of medication, as she will remain at risk for returns of disease activity and related autoimmune conditions. Thank you for your understanding in accommodating her health needs.

Sincerely,

Colin Ligon, MD MHS
Adult Rheumatology
Penn Medicine Multispecialty Group

1001 Chesterbrook Blvd | Berwyn | PA | 19312 | 215-316-5151

Exhibit N



Penn
**Human Resources**
Staff and Labor Relations

**VI ELECTRONIC MAIL**

December 24, 2025

Cheryl Hardy
7413 Cornerstone Dr
Newtown Square, PA 19073-4557
Email: cnc1233@gmail.com

Dear Cheryl,

The Division of Human Resources, Staff, and Labor Relations has concluded its investigation into your complaint concerning alleged violations of the Family and Medical Leave Act (FMLA) and claims of retaliatory reassignment of supervisory duties involving Claire Wallace, Associate Dean for Academic Affairs and Registrar; Angela Cabrera, Executive Director of Human Resources; and Chris Wailoo, Associate Dean for Finance and Administration and Chief Financial Officer at Penn Carey Law.

Our office conducted a thorough review of the information provided and carefully evaluated the concerns raised. Based on the findings of this review, we determined that the available evidence does not substantiate a violation of University policy.

We would also like to take this opportunity to reaffirm the University's commitment to maintaining a respectful and inclusive environment. The University encourages all community members to raise concerns related to discrimination or retaliation, and we appreciate your willingness to come forward.

Based on our review, this matter was appropriately reviewed, investigated, and addressed, and is now considered closed.

Sincerely,

*Lynnea Carrington*

Lynnea Carrington
Senior Staff and Labor Relations Specialist

CC: Jeff Rowland, Executive Director, Staff and Labor Relations

Exhibit O

# Staff Grievance Procedure

## 620.1 INTRODUCTION

Regular and effective communication between supervisors and staff members reduces the likelihood of misunderstanding and conflict. The University expects and encourages supervisors and staff members to communicate openly and regularly so that the interests of the staff and the University are best served. To support this commitment, the University has a Workplace Issue Resolution Program (WIRP) and this Grievance Procedure. Resource Offices at the University such as the Division of Human Resources/Staff and Labor Relations, Office of the Ombuds, Equal Opportunity Programs, the African American Resource Center, the Lesbian Gay Bisexual Transgender Center, and the Penn Women's Center will assist staff members in resolving issues or concerns using the WIRP or Grievance Procedure. Staff members who have concerns about the administration of University or departmental policy, are encouraged to try to resolve them by working with their department head or one of the Resource Offices.

The Staff Grievance Procedure is designed to provide a fair and equitable resolution for concerns related to terms or conditions of employment that are not resolved to the staff member's satisfaction through the WIRP or where the dispute may not be addressed through the WIRP. Retaliation against a staff member for utilizing this Grievance Procedure violates University policy and will result in appropriate disciplinary action, up to and including termination. Any staff member who believes that s/he has been retaliated against or treated unfairly for utilizing the Grievance Procedure should contact the Division of Human Resources/Staff and Labor Relations or another University Resource Office.

## 620.2 DEFINITION

A grievance is defined as an unresolved issue concerning the application of University policy, practice, or procedure. This includes disciplinary action, involuntary termination, allegations of discrimination on the basis of race, sex, sexual orientation, gender identity, religion, color, national or ethnic origin, age, disability, or veteran status.

Complaints regarding performance appraisals, flexible work options decisions, reductions in the size of the workforce, restructuring, change in reporting line and/or the designation of individuals for redeployment or separation from a unit are not matters subject to a grievance under this policy.

Complaints regarding compensation and classification are only grievable if a violation of federal, state or local equal opportunity or labor laws is alleged. Other complaints of this nature are handled administratively. Questions regarding the administrative review process should be directed to the Division of Human Resources/Compensation.

## 620.3 ELIGIBILITY

All regular University staff members (including regular limited service staff members) who have completed their introductory period are eligible to utilize this process to resolve issues arising from their employment. Faculty, ungraded administrators, university officers, health system clinicians, non-university employees employed by the University of Pennsylvania Health System and unionized employees have separate procedures and are not eligible to file grievances under this procedure. Residents, occasional or temporary workers are not eligible to file a grievance under this procedure.

## 620.4 PROCEDURE

The Division of Human Resources/Staff and Labor Relations administers the Staff Grievance Procedure. In grievances in which unlawful discrimination is alleged, the Office of Equal Opportunity Programs assists in the administration of the procedure. All time frames and other procedural requirements must be adhered to unless the Division of Human Resources grants an extension or exemption. Extensions will only be granted for compelling reasons. If the grievant fails to respond within specified time frames (including any approved extensions) the grievance may be dismissed. If the respondent fails to respond within specified time frames (including any approved extensions) he/she may be subject to disciplinary action.

Both the grievant and respondent may be assisted throughout this process by an employee representative. These representatives must be regular or retired faculty or staff members. The head of the responding department must approve all employee representatives for respondents.

Staff members must initiate action within the following time frames in order to reserve the right to request a panel hearing under the Staff Grievance Procedure:

- *If not utilizing the WIRP first: The grievant must submit a completed grievance form within thirty (30) working days of the date of the event giving rise to the grievance.*
- *If utilizing the WIRP first: The staff member must initiate action under the WIRP within thirty (30) working days of the date of the event giving rise to the grievance. If no resolution is reached through the WIRP, the staff member then has ten (10) working days from the final attempt to resolve the issue through the WIRP to submit a completed grievance form.*
- *If terminated from employment: The grievant has ten (10) working days from notice of termination of employment to submit a grievance form.*

The completed grievance form must be submitted to the Division of Human Resources/Staff and Labor Relations at 600 Franklin Building, 3451 Walnut Street, Philadelphia, PA 19104-6228.

Every effort will be made to hold the hearing within thirty (30) working days. The Panel must submit recommendations for resolution in writing to the President or designee within five (5) working days of the completion of the hearing. The President or designee will notify the grievant and respondent of the final decision in writing within ten (10) working days of receipt of the recommendations from the panel.

Note: A Grievance Procedure Manual describing the process in detail is available from any of the University Resource Offices or by clicking here.

Policy Number: 620
Effective Date: 05/09/2006
Supersedes Policy Number(s): 620 (01/12/1999), 01/01/2000
Applicability: All Regular Staff Members
Cross-reference: Policy 001, Policy 201

Policy Manual Disclaimer

Exhibit P

---------- Forwarded message ---------
From: **Claire E. Wallace** <cwallac2@law.upenn.edu>
Date: Wed, Jan 28, 2026 at 10:28 AM
Subject: PCL Return to Work Update
To: cnc1233@gmail.com <cnc1233@gmail.com>, Cheryl Hardy <chardy1@law.upenn.edu>
Cc: Angela Cabrera <angelacm@law.upenn.edu>


Dear Cheryl,


I hope the new year finds you well.


I am writing in connection with your current administrative leave with pay, which has been in effect since October 13, 2025.  In addition, as you know from correspondence with the Division of Human Resources, Staff and Labor Relations, the investigation into your allegations of policy violations concluded without substantiating those allegations.


As part of our preparations for your return to work, I am asking that you please prepare and submit a written operations and planning report for 2026.  This is an important exercise which has been required of all the LEP team members.  The document should describe the major planned and anticipated projects for LEP for the remainder of the fiscal year ahead, including key deliverables, milestones, and measures of success.  In addition, it should provide an update on the status of the goals you shared in LEP's annual report for FY26 (submitted June 30, 2025) and that you discussed during LEP's annual meeting with the dean (August 6, 2025) this past summer.   We have taken steps to ensure you have appropriate access to electronic resources for this exercise.

You can login to the LEP SharePoint site with your LawKey credentials.

Please submit this document to me by **Wednesday, February 11**, by emailing it to me at cwallace@law.upenn.edu.

In addition, we have scheduled an in-person meeting with you on **Thursday, February 26, at 1:00 pm**, at which Ms. Carrington will also be present, to discuss your reintroduction to the work environment, your responsibilities, and professional expectations with respect to a respectful and inclusive environment.  As part of that conversation, we will also discuss your conduct during our October 8, 2025, meeting, as well as continue our conversation about concerns raised by colleagues regarding your supervision.

You will remain on paid administrative leave during this period, and I am available as your point of contact should you have any questions.  We look forward to reviewing your operations and planning report.

Sincerely,

Claire

--

Claire E. Wallace  L'95

Senior Associate Dean, Academic Affairs

Penn Carey Law Registrar

University of Pennsylvania Carey Law School

3501 Sansom Street, Philadelphia, PA 19104

Registrar's Office: reg@law.upenn.edu

