**United States District Court for the Eastern District of Pennsylvania**

Cheryl D. Hardy                              :
                                             :
        vs                                   :        Civil Action No. 26-849
                                             :
The Trustees of the University of            :
Pennsylvania, Sophia Lee, Christopher        :        **Jury Trial Demanded**
Wailoo, Claire Wallace, Angela Cabrera,      :
Jo-Ann Verrier, Ian Semmler, and             :
Christine Droesser                           :

*Amended Complaint*

Plaintiff, Cheryl D. Hardy, brings a series of claims against Defendants, The Trustees of the University of Pennsylvania, Sophia Lee, Christopher Wailoo, Claire Wallace, Angela Cabrera, Jo-Ann Verrier, Ian Semmler, and Christine Droesser, of which the following is a statement:

1.      This case concerns the utter failure of the management and leadership of the University of Pennsylvania and the University of Pennsylvania Carey School of Law to safeguard the rights of a long-time senior employee and alumna, and to take any action to prevent that result when they were expressly told, in real time, that it would occur. Defendants engaged in interfering, reckless, retaliatory, and discriminatory actions with total disregard for the consequences their actions could and did have on Hardy's physical and emotional well-being, and in the process violated established laws and University of Pennsylvania processes, procedures, and protocols.

*Jurisdiction and Venue*

2.      This Court has original jurisdiction to hear this Complaint and adjudicate the claims stated herein under 28 U.S.C. §§ 1331 and 1343, this action being brought under the

Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., the Americans With Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., and the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071 (Nov. 21, 1991), to redress and enjoin the discriminatory and retaliatory practices and interference of defendants.  This Court may exercise supplemental jurisdiction over Hardy's state law claim pursuant to 28 U.S.C. §1367.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this case occurred in this judicial district.

4.      Hardy timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") alleging disability discrimination and retaliation.  The Amended Complaint is being filed within 90 days of her receipt of a Notice of Right to Sue ("NRTS") from the EEOC.

### *Parties*

5.      Plaintiff, Cheryl D. Hardy is a female citizen of the United States and a resident of this judicial district.

6.      Defendant, The Trustees of the University of Pennsylvania ("Penn"), is the governing body overseeing the University of Pennsylvania, and provides undergraduate and graduate programs, including in law through the University of Pennsylvania Carey Law School ("Carey" or the "Law School"), and other disciplines.  It has a principal place of business located at 3819 Chestnut Street, Philadelphia, Pennsylvania 19104.

7.      Defendant, Sophia Lee, is Dean of Carey, the Bernard G. Segal Professor of Law, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

8.      Defendant, Christopher Wailoo, is the Associate Dean for Finance and Administration and Chief Financial Officer at Carey, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

9.      Defendant, Claire Wallace, is the Associate Dean for Academic Affairs and Registrar at Carey, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

10.      Defendant, Angela Cabrera, is the Executive Director of Human Resources, at Carey, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

11.      Defendant, Jo-Ann Verrier, is the former Vice Dean and Head of Human Resources at Carey, and currently Carey's Human Resources Consultant, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

12.      Defendant, Ian Semmler, is the Director of Fiscal Operations at Carey, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

13.      Defendant, Christine Droesser, is the Associate Dean and Chief Information Officer at Carey, and has a principal place of business at 3501 Sansom Street, Philadelphia, Pennsylvania 19104.

14.      At all times relevant to this action, defendants were "employers" within the meaning of the FMLA, the ADA, and applicable state law.

15.      The acts set forth in this Complaint were authorized, ordered, condoned, ratified and/or done by defendants' officers, agents, employees and/or representatives while actively engaged in the management of defendants' business and pursuant to defendants' official policies and customs.

### *Background Facts*

16.     Hardy is a 1994 alumna of Carey and was employed by Penn as the Associate Dean, Legal Education Programs, at Carey for over 15 years with an unblemished record of service and leadership.  Penn terminated Hardy on March 4, 2026, in violation of the FMLA, because of her disability, and in retaliation for exercising her rights under the FMLA, the ADA, and state law.

17.     Hardy suffers from a debilitating and extremely dangerous autoimmune condition, giant cell arteritis, which was diagnosed in April 2024 by Penn's physicians and which was known to her supervisor, Wallace, and others.

18.     In September 2025, one of Hardy's direct reports (hereafter "Employee A"), sought the immediate termination of another of Hardy's direct reports (hereafter "Employee B").  Hardy was keenly aware of Employee A's frustration with Employee B, was concerned about Employee A's mental state, and limited Employee A's contact with Employee B where she could.  Hardy explained to Employee A that there were University policies, processes, and procedures that had to be followed and that she could not immediately terminate Employee B.

19.     To escalate Employee A's concerns, Hardy reached out to both Cabrera and Wallace as early as September 19, 2025, by email, in-person, and text.  Hardy advised Employee A to continue to document his concerns and told Employee A she was doing what she could to give Employee A the opportunity to address the concerns, including the departmental concerns, directly with Cabrera and Wallace.

20.     On September 26, 2025, Employee A told Hardy that Cabrera continually rescheduled a meeting, and that the meeting between Cabrera and Employee A now was scheduled for the week of September 29, 2025.

21.    On September 29, 2025, at 10:38 a.m., Hardy emailed Cabrera stating that Employee A was scheduled to meet with Cabrera that week, and that she wanted to forward an email to her sent by Employee A to Hardy regarding Employee A's concerns.

22.    On October 3, 2025, Employee A told Hardy the meeting with Cabrera that week did not take place and that Employee A was becoming increasingly frustrated.  In response, that same day Hardy sent a text message to Wallace asking Wallace to call her.  Wallace did not reply until October 6, 2025.

23.    On October 7, 2025, Hardy received a text message from Wallace stating that Cabrera wanted to meet the morning of October 8, 2025, before making any outreach to Employee A.

24.    On October 8, 2025, Hardy asked Cabrera if she had connected with Employee A. Cabrera lied and said she had done so, even though Employee and Wallace expressly stated that she had not.

25.    On October 8, 2025, during a Teams meeting call at 10:00am, Cabrera was visibly agitated, verbally scolded Hardy, told Hardy she would not speak with her about Employee A, and stated that Wallace was not permitted to tell Hardy that Employee A had spoken with Wallace and Wailoo.  Hardy was stunned.  To protect her health and well-being, Hardy replied "okay", politely left the call, and sent an email to Wallace informing Wallace of what Cabrera said; that the situation was now out of Hardy's hands; and that it was fine with Hardy that Wallace and Cabrera proceed with Employee A's complaint as they saw fit.  *See* Exhibit A attached hereto and made a part hereof.

26.    Hardy told Wallace she did not feel comfortable attending a 2:00pm meeting with Cabrera, to which Wallace had summoned her, due to her medical condition, and given what

Cabrera had said, Hardy asked if it was necessary that she attend the meeting. Wallace insisted that Hardy attend the 2:00 PM meeting. *Id.*

27.    At the outset of the October 8, 2025 meeting, Hardy asked Wallace if she had received the email regarding her medical condition. Wallace chuckled, smiled and replied, "Yes, I have never heard that." Hardy took her backpack to the meeting fully intending to leave for the day after the meeting as she already felt her stress level increasing.

28.    During the October 8, 2025 meeting, Cabrera had in her hands a 4-5 page document. Hardy stated she would provide a response to Employee A's complaint if she were given the opportunity to view it in its entirety. Cabrera and Wallace repeatedly refused Hardy's request, and instead repeatedly pressured Hardy to provide a response. In fact, although she refused to give Hardy a copy of Employee A's complaint, Cabrera told Hardy that she needed a response by Friday, October 10, 2025.

29.    Hardy told Wallace and Cabrera that if Employee B was to be terminated, it should have happened long ago for what was probably stated in Employee A's complaint and much more, but that her prior manager and Head of Human Resources, Verrier, consistently circumvented the termination and told Hardy to lean into what Employee B could do best and the department would be given another full-time employee.

30.    Despite Wallace repeating confidential human resource information about Employee A of which she should have had no knowledge, when asked, Wallace stated the confidential information was told to her by Verrier. Wallace and Cabrera claimed to have no knowledge of any human resources information about Employee B and continued to pressure Hardy to provide a response to Employee A's complaint without allowing her to see the complaint.

31.    During the meeting Hardy stated that the process Wallace and Cabrera were engaging in was highly unethical and did not comply with Penn policies, processes, and procedures.  At the conclusion of the meeting, Hardy reiterated to Wallace and Cabrera that their actions seriously negatively impacted her health, and further told them she intended to file an internal complaint against them because of their conduct and their unethical processes and procedures.

32.    During the evening of October 8, 2025, Hardy entered a request for four (4) sick/FMLA days in Penn's Workday system, noting in the "Comments" section that due to mishandling of a work situation, she was requesting sick days to prevent a flare up of her autoimmune condition. Hardy's request was approved, which was acknowledged by Wallace in an email on which Cabrera was copied, stating that she hoped Hardy was doing well, but still demanding a reply to the complaint.  *See* Exhibit B attached hereto and made a part hereof.

33.    On October 9, 2025, Hardy printed out the required FMLA forms, accessed the MyPenn Medicine portal and told her doctor that she was experiencing a very difficult and stressful work situation, that the right side of her head, right eye, and face were hurting, and that she would drop off the FMLA forms for him to complete.

34.    While entering her request for FMLA into Workday, Hardy saw that at 6:38 pm, October 8, 2025, Employee A submitted a request for four sick days off, stating "Hi Cheryl, ▮

███████████████████████████████████████████

███████ . . ." at Cabrera's suggestion, further evidencing that Cabrera did not meet with Employee A until after the 2:00 p.m. meeting on October 8, 2025.  *See* Exhibit C attached hereto and made a part hereof.  Employee A's request for four sick days should have also triggered FMLA but Hardy did not receive a notice.   On October 8, 2025, at 8:12 pm, Hardy received an

email from Cabrera thanking Hardy for attending the meeting with her and Wallace, asking her to reply to four bullet points that had been copied and pasted into the email (which contained several inaccuracies), and stating that she needed Hardy's response by October 10, 2025.

35.     Workday is Penn's propietary platform that harnesses powerful, cloud-based technology to enhance security and compliance.  Penn uses Workday for human resources, payroll, and job-related learning.  Workday provides the Penn community with 24/7 access to a secure network.  With Workday, users are empowered to complete several categories of functionality, including entering time and reviewing and approving time for others, and requesting time off and leave, and reviewing and approving leave for others.  Requests for FMLA leave are made and managed through Workday.

36.     Workday allows a user to delegate certain Workday business process items to another user as permitted by the relevant policy.  However, tasks can only be delegated by the user themselves, unless they are incapacitated and must be delegated to someone in an equal or more senior position to the user.  At the time in question, all delegations were required to be approved by Semmler, with the assistance of Droesser, who determine if the delegation is appropriate.

37.     After Hardy submitted her FMLA request on October 8, 2025, on October 10, 2025, Hardy received a notice through Penn's Workday system that a 22-day FMLA leave request, from October 9, 2025, through October 31, 2025, had been submitted and processed on her behalf, unilaterally overriding Hardy's FMLA submission.  *See* Exhibit D attached hereto and made a part hereof.

38.     At no time did Hardy authorize anyone to submit any FMLA leave request on her behalf.

39.    Hardy replied that she had only requested four FMLA sick days and would be returning to work the following week.  *Id.*

40.    Dawn Lewis, Senior Benefits Specialist, FMLA/STD, Division of Human Resources replied that "Someone had to request the FMLA days, which means if you did not, your manager or someone else in the department requested the FMLA time." *Id.*

41.    Section 631.5 of Penn's FMLA Policy provides that the *employee* must initiate their leave through Workday and only if the employee is unable to make the request on their own, the employee's supervisor can make the request on the employee's behalf if requested by the employee or the employee's representative.

42.    Following submission of the unauthorized 22-day FMLA request, Hardy's Workday supervisory permissions and team management authority were reassigned and delegated to Wallace and Cabrera.  *Id.*

43.    Hardy did not submit this request.  Delegation of Workday responsibilities require strict adherence to Penn's processes and security protocols and provides that the individual submit the request for delegation in alignment with the step-by-step guide.  Only if the individual is incapacitated can a supervisor initiate this action. In addition, the delegate(s) have to be in a similar or higher position which Cabrera is not.  *Id.*

44.    Hardy emailed Wallace on October 10, 2025, asking Wallace if she had put in the 22-day FMLA request for Hardy.  Hardy followed up with another email to Wallace asking if Wallace submitted a request delegating her Workday tasks to Wallace and Cabrera as Hardy did not submit the request.  *See* Exhibit E attached hereto and made a part hereof.   Hardy also sent a text message to Wallace asking the same questions.

45.     Wallace responded back by email.  "Hi – again, I think Angela [Cabrera] can answer this. In response to the Workday delegation, Wallace replied by email saying "I did not. I'm copying Angela [Cabrera] here and ask that she reply."   *See* Exhibit D attached hereto and made a part hereof.  Wallace also replied via email, "I got a notice from Ian that I was your delegate." *Id.*

46.     Wallace replied by text "I've copied Angela on your messages.  I think she can best answer the FMLA and Workday delegation.  I have not submitted anything other than what came into my mailbox today –          requested time off and I see Julia's time sheet is in.  Let me know if you have any questions and I wish you a speedy recovery.  *See* Exhibit F attached hereto and made a part hereof.

47.     On October 10, 2025, at 4:49pm, by email Hardy told Wallace that Hardy had not authorized anyone submitting a FMLA request on her behalf, that Hardy was the only person authorized to initiate the delegation of her tasks in Workday, and that Wallace and Cabrera were not in compliance with Penn processes and procedures and had overridden security protocols. *See* Exhibit D attached hereto and made a part hereof.

48.     On October 10, 2025, Hardy sent an email to Lynnea Carrington, the Law School contact in University Human Resources, stating she wished to file a formal complaint/grievance against Wallace, Wailoo, and Cabrera, and that Hardy was concerned about retaliation and was very unfamiliar with these processes.  *See* Exhibit G attached hereto and made a part hereof.

49.     On October 11, 2025, Hardy later received an email from Cabrera stating that Cabrera and others had unilaterally "proactively" decided to submit the 22-day request on Hardy's behalf in response to Hardy's statement during the October 8, 2025 meeting that she

intended to file a complaint against Cabrera and Wallace.  *See* Exhibit D attached hereto and made a part hereof.

50.     These actions on the part of Cabrera and others violated the ADA, the FMLA, as well as Sections 631.3 (Qualified Leave Reasons) and 631.5 (Application) of the University's FMLA Policy and Procedure Manual, *see* Exhibit H attached hereto and made a part hereof.

51.     On October 10, 2025, Hardy informed Lee and R. Polk Wagner, Deputy Dean of Academic Affairs of the Law School, that she intended to file an internal complaint against Wallace, Cabrera, and Wailoo, who oversees all of the departments involved in processing the unauthorized 22-day FMLA request, overriding security protocols, and delegating Hardy's job responsibilities in Workday to Wallace and Cabrera, removing access to Workday, email, and the entire MS365 office suite, and placing a first-person out-of-office message as an automatic reply in Outlook.  Hardy expressly advised Lee about these events, that she would be taking four (4) days off to temper her stress due to her medical condition, that she could not stop crying when thinking about what Wallace, Cabrera, and others were doing to her, and that she would return to work on October 15, 2025.  *See* Exhibit I attached hereto and made a part hereof.  Lee was fully aware and took no action to address Hardy's situation or concerns.

52.     On October 11, 2025 at 8:06 a.m., Hardy sent an email to Wallace stating that with things unfolding as they were, Hardy was compelled to return to work on Monday, October 13, 2025.  On October 12, 2025 at 7:45 p.m., Wallace replied, requesting that Hardy work from home "given the way things transpired' and concluded in last week's meeting and in the meantime please let her know when Wallace could expect Hardy's responses to ▮▮▮ complaint.' " *See* Exhibit J attached hereto and made a part hereof.

53.    On October 13, 2025, at 7:12 AM, Hardy submitted a formal complaint against Wallace, Cabrera, and Wailoo.  *See* Exhibit K attached hereto and made a part hereof.

54.    After previously stating on October 12, 2025, that Hardy should work from home, on October 13, 2025, at 8:45 AM, Wallace notified Hardy "that, in light of the nature of your behavior and the concerns raised in our meeting with Angela Cabrera on Thursday, October 9, it is necessary to place you on an immediate leave of absence with pay," and that she was temporarily relieved of her duties.  *See* Exhibit L attached hereto and made a part hereof.  In addition, Hardy's email account, MS365 access, and access to Workday were suspended, Wallace and Cabrera took over all of Hardy's accounts and, in further violation of policy, placed a first-person impersonation of Hardy in an automatic out of office reply on her email account.

55.    All of defendant's actions took place while Hardy was out on approved and certified FMLA leave, further interfering with her ability to address her medical condition.

56.    On October 14, 2025, in response to Wallace downplaying the seriousness of Hardy's disability, Dr. Colin Ligon placed in Hardy's MyChart portal a letter describing Hardy's disability in detail.  *See* Exhibit M attached hereto and made a part hereof.

57.    On October 20, 2025, Hardy met with Lynnea Carrington, Sr. Staff and Labor Relations Specialist, Penn's Division of Human Resources, regarding Hardy's internal complaint.  Carrington told Hardy that she would investigate Hardy's internal complaint.

58.    On December 24, 2025, Carrington informed Hardy through a letter sent by email that she had concluded her investigation of Hardy's internal complaint against Wallace, Cabrera, and Wailoo, that her investigation did not substantiate a violation of Penn policy, and that Penn considered the matter closed.  *See* Exhibit N attached hereto and made a part hereof.  However, Hardy was never interviewed, allowed to submit evidence, or given a copy of the investigation

report as required by Penn's Formal Grievance Policy. *See* Exhibit O attached hereto and made a part hereof.

59.  By email dated January 28, 2026, Wallace informed Hardy that she expected Hardy to complete an operations and planning report for 2026 by February 11, 2026, effectively placing Hardy on a performance improvement plan, and to formally return to work on February 26, 2026. In making this return-to-work directive, Wallace expressly referenced, and stated that she would address on February 26 at an in-person meeting with Carrington present, "your conduct during our October 8, 2025, meeting, as well as continue our conversation about concerns raised by colleagues regarding your supervision." *See* Exhibit P attached hereto and made a part hereof.

60.  Under the circumstances, by sending the January 28, 2026 email and expressly referencing the October 8, 2025 meeting as to which Hardy had filed a formal internal complaint and the impact of which significantly endangered Hardy's health, Wallace and defendants perpetuated and condoned a toxic and hostile work environment for Hardy, further placing Hardy's physical and mental well-being in jeopardy.

61.  By email dated March 4, 2026, Penn terminated Hardy's employment. *See* Exhibit Q attached hereto and made a part hereof. Although Wallace claims in the email that Penn's Quit Without Notice Policy allowed her to record Hardy's termination as a voluntary termination, the facts set forth above indicate that by virtue of her disability and health condition, and defendant's failure to accommodate them, and providing defendants the power to control Hardy's FMLA as they saw fit, Hardy already had provided notice to defendants that she would not be able to return to work on February 26, 2026, because doing so would further place her physical and mental well-being in jeopardy.

62. Because of her diagnosis of giant cell arteritis, Hardy had a disability within the meaning of the ADA.

63. Defendants terminated Hardy because of her disability, perceived disability or record of having been disabled, in violation of the ADA, in violation of the FMLA, and in retaliation for exercising her rights under the ADA, the FMLA, and state law.

64. Hardy has suffered, is now suffering, and will continue to suffer severe emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses as a direct and proximate result of defendants' actions.

65. By reason of defendants' discrimination, retaliation and interference, Hardy suffered and will suffer in the future extreme harm, including loss of income and other employment benefits, loss of professional opportunities, embarrassment and humiliation.

66. Defendants acted and failed to act willfully, maliciously, intentionally, and with reckless disregard for Hardy's rights.

### *Count I*

### *Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.*

67. Plaintiff incorporates herein by reference as if set forth in full the averments of paragraphs 1-66, inclusive, of this Complaint.

68. When employees invoke rights granted under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" those rights, nor may employers "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful."

69. The actions of defendants described above in submitting and processing an unauthorized request on Hardy's behalf, without appropriate medical certification, for 22 days of

FMLA leave, for defendants' own nefarious reasons, under circumstances where Hardy had a finite number of FMLA and sick days available to her, constituted interference with and restraint of her FMLA rights because defendants effectively unilaterally denied Hardy and her physician the right and opportunity to manage her health condition by utilizing her available FMLA leave in a manner that she and her physician deemed necessary.

70.    Individual supervisors, managers, human resource professionals and others working for an employer may be liable as an employer under the FMLA.

71.    Hardy is an eligible employee under the FMLA, defendants are employers subject to the FMLA's requirements, Hardy was entitled to FMLA leave, Hardy gave notice to defendants of her intention to take FMLA leave, Hardy suffered an adverse employment decision after invoking her right to FMLA leave, the adverse employment decision was causally related to her invocation of her FMLA rights, and she effectively was denied benefits to which she was entitled under the FMLA.

72.    The actions of the defendants described above constitute interference with Hardy's FMLA rights and retaliation for her invocation of her FMLA rights.

73.    Defendants' conduct deprived Hardy of the rights, privileges, and immunities guaranteed to her under the FMLA.

74.    By reason of defendants' interference and retaliation, Hardy is entitled to all legal and equitable relief available under the FMLA, including liquidated damages.

### ***Count II***

### *The Americans With Disabilities Act, 42 U.S.C. § 12101 et seq.*

75.    Plaintiff incorporates herein by reference as if set forth in full the averments of paragraphs 1-74, inclusive, of this Complaint.

76. Defendants discriminated and retaliated against Hardy, a qualified individual with a disability, by failing to make reasonable accommodations to her known limitations, and by otherwise discriminating and retaliating against her because of her disability, in violation of the ADA.

77. Defendants' conduct was intentional, deliberate, willful and in callous disregard of Hardy's rights and physical well-being.

78. By reason of defendant's discrimination and retaliation, Hardy is entitled to all legal and equitable relief available under the ADA.

### *Count III*

#### *Intentional Infliction of Emotional Distress*

79. Plaintiff incorporates herein by reference as if set forth in full the averments of paragraphs 1-78, inclusive, of this Complaint.

80. The conduct of the defendants described above was extreme and outrageous, intentional or reckless, and caused Hardy severe emotional distress.

81. By reason of defendants' intentional infliction of emotional distress upon Hardy, she is entitled to all available legal and equitable relief.

### *Jury Demand*

82. Hardy hereby demands a trial by jury as to all issues so triable.

### *Prayer for Relief*

Wherefore, Plaintiff, Cheryl D. Hardy, respectfully prays that the Court:

a. adjudge, decree and declare that the actions and practices of defendants complained of herein violated her rights under the FMLA, the ADA and common law;

b. order defendant Penn to provide appropriate job relief to Hardy;

c.      enter judgment in favor of Hardy and against defendants for all available remedies and damages under law and equity, including, but not limited to, back pay, front pay, past and future mental anguish and pain and suffering, and liquidated damages in amounts to be determined at trial;

d.      order defendants to pay the attorney's fees, costs, expenses and expert witness fees of Hardy associated with this case;

e.      grant such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable; and

f.      retain jurisdiction until such time as the Court is satisfied that defendants have remedied the unlawful and illegal practices complained of herein and are determined to be in full compliance with the law.

_____*s/Robert T Vance Jr*_____
Robert T Vance Jr, Esquire
Law Offices of Robert T Vance Jr
123 South Broad Street, 15th Floor
Philadelphia PA 19110
267 887 0172 tel / 215 501 5380 fax
rvance@vancelf.com

*Attorney for Cheryl D. Hardy*